Opinion by Chief Judge KOZINSKI; Partial Concurrence and Partial Dissent by Judge IKUTA.
OPINION
KOZINSKI, Chief Judge:
There’s no place like home. In the privacy of your own home, you can take off your coat, kick off your shoes, let your guard down and be completely yourself. While we usually share our homes only with friends and family, sometimes we need to take in a stranger to help pay the rent. When that happens, can the government limit whom we choose? Specifically, do the anti-discrimination provisions of the Fair Housing Act (“FHA”) extend to the selection of roommates?
FACTS
Roommate.com, LLC (“Roommate”) operates an internet-based business that helps roommates find each other. Roommate’s website receives over 40,000 visits a day and roughly a million new postings for roommates are created each year. When users sign up, they must create a profile by answering a series of questions about their sex, sexual orientation and whether children will be living with them. An open-ended “Additional Comments” section lets users include information not prompted by the questionnaire. Users are asked to list their preferences for roommate characteristics, including sex, sexual orientation and familial status. Based on the profiles and preferences, Roommate matches users and provides them a list of housing-seekers or available rooms meeting their criteria. Users can also search available listings based on roommate characteristics, including sex, sexual orientation and familial status.
The Fair Housing Councils of San Fernando Valley and San Diego (“FHCs”) sued Roommate in federal court, alleging that the website’s questions requiring disclosure of sex, sexual orientation and familial status, and its sorting, steering and matching of users based on those characteristics, violate the Fair Housing Act (“FHA”), 42 U.S.C. § 3601 et seq., and the California Fair Employment and Housing Act (“FEHA”), Cal. Gov’t Code § 12955.
The district court initially dismissed the claims, holding that Roommate was immune under section 230 of the Communications Decency Act (“CDA”), 47 U.S.C. § 230. We reversed, holding that Roommate was protected by the CDA for publishing the “Additional Comments” section, but not for (1) posting questionnaires that required disclosure of sex, sexual orientation and familial status; (2) limiting the *1219 scope of searches by users’ preferences on a roommate’s sex, sexual orientation and familial status; and (3) a matching system that paired users based on those preferences. Fair Hous. Council v. Roommates.com, LLC, 521 F.3d 1157, 1166 (9th Cir.2008) (en banc).
Our opinion was limited to CDA immunity and didn’t reach whether the activities, in fact, violated the FHA. On remand, the district court held that Roommate’s prompting of discriminatory preferences from users, matching users based on that information and publishing these preferences violated the FHA and FEHA, and enjoined Roommate from those activities. Roommate appeals the grant of summary judgment and permanent injunction, and also the district court’s order awarding the FHCs $494,714.40 in attorney’s fees. The FHCs cross-appeal the amount of the attorney’s fees.
STANDING
Roommate argues that the FHCs lack standing because they didn’t suffer actual injury. We’ve held that an organization has “direct standing to sue [when] it showed a drain on its resources from both a diversion of its resources and frustration of its mission.” Fair Hous. of Marin v. Combs, 285 F.3d 899, 905 (9th Cir.2002). However, “ ‘standing must be established independent of the lawsuit filed by the plaintiff.’ ” Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 943 (9th Cir.2011) (quoting Walker v. City of Lakewood, 272 F.3d 1114, 1124 n. 3 (9th Cir.2001)). An organization “cannot manufacture [an] injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.” La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1088 (9th Cir.2010); see also Combs, 285 F.3d at 903 (“[A]n organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit .... ” (internal quotation marks omitted)).
Prior to commencing litigation, the FHCs investigated Roommate’s alleged violations and, in response, started new education and outreach campaigns targeted at discriminatory roommate advertising. The resources spent on those campaigns were not associated with litigation. Because Roommate’s conduct caused the FHCs to divert resources independent of litigation costs and frustrated their central mission, we conclude that the FHCs have organizational standing.
ANALYSIS
If the FHA extends to shared living situations, it’s quite clear that what Roommate does amounts to a violation. The pivotal question is whether the FHA applies to roommates.
I
The FHA prohibits discrimination on the basis of “race, color, religion, sex, familial status, or national origin” in the “sale or rental of a dwelling.” 42 U.S.C. § 3604(b) (emphasis added). The FHA also makes it illegal to
make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.
Id. § 3604(c) (emphasis added). The reach of the statute turns on the meaning of “dwelling.”
*1220 The FHA defines “dwelling” as “any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families.” Id. § 3602(b). A dwelling is thus a living unit designed or intended for occupancy by a family, meaning that it ordinarily has the elements generally associated with a family residence: sleeping spaces, bathroom and kitchen facilities, and common areas, such as living rooms, dens and hallways.
It would be difficult, though not impossible, to divide a single-family house or apartment into separate “dwellings” for purposes of the statute. Is a “dwelling” a bedroom plus a right to access common areas? What if roommates share a bedroom? Could a “dwelling” be a bottom bunk and half an armoire? It makes practical sense to interpret “dwelling” as an independent living unit and stop the FHA at the front door.
There’s no indication that Congress intended to interfere with personal relationships inside the home. Congress wanted to address the problem of landlords discriminating in the sale and rental of housing, which deprived protected classes of housing opportunities. But a business transaction between a tenant and landlord is quite different from an arrangement between two people sharing the same living space. We seriously doubt Congress meant the FHA to apply to the latter. Consider, for example, the FHA’s prohibition against sex discrimination. Could Congress, in the 1960s, really have meant that women must accept men as roommates? Telling women they may not lawfully exclude men from the list of acceptable roommates would be controversial today; it would have been scandalous in the 1960s.
While it’s possible to read dwelling to mean sub-parts of a home or an apartment, doing so leads to awkward results. And applying the FHA to the selection of roommates almost certainly leads to results that defy mores prevalent when the statute was passed. Nonetheless, this interpretation is not wholly implausible and we would normally consider adopting it, given that the FHA is a remedial statute that we construe broadly. Therefore, we turn to constitutional concerns, which provide strong countervailing considerations.
II
The Supreme Court has recognized that “the freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights.” Bd. of Dirs. of Rotary Int’l v. Rotary Club of Duarte, 481 U.S. 537, 545, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). “[C]hoices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme.” Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Courts have extended the right of intimate association to marriage, child bearing, child rearing and cohabitation with relatives. Id. While the right protects only “highly personal relationships,” IDK, Inc. v. Clark Cnty., 836 F.2d 1185, 1193 (9th Cir.1988) (quoting Roberts, 468 U.S. at 618, 104 S.Ct. 3244), the right isn’t restricted exclusively to family, Bd. of Dirs. of Rotary Int’l, 481 U.S. at 545, 107 S.Ct. 1940. The right to association also implies a right not to associate. Roberts, 468 U.S. at 623, 104 S.Ct. 3244.
To determine whether a particular relationship is protected by the right to intimate association we look to “size, purpose, selectivity, and whether others are *1221 excluded from critical aspects of the relationship.” Bd. of Dirs. of Rotary Int'l, 481 U.S. at 546, 107 S.Ct. 1940. The roommate relationship easily qualifies: People generally have very few roommates; they are selective in choosing roommates; and non-roommates are excluded from the critical aspects of the relationship, such as using the living spaces. Aside from immediate family or a romantic partner, it’s hard to imagine a relationship more intimate than that between roommates, who share living rooms, dining rooms, Mtchens, bathrooms, even bedrooms.
Because of a roommate’s unfettered access to the home, choosing a roommate implicates significant privacy and safety considerations. The home is the center of our private lives. Roommates note our comings and goings, observe whom we bring back at night, hear what songs we sing in the shower, see us in various stages of undress and learn intimate details most of us prefer to keep private. Roommates also have access to our physical belongings and to our person. As the Supreme Court recognized, “[w]e are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings.” Minnesota v. Olson, 495 U.S. 91, 99, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Taking on a roommate means giving him full access to the space where we are most vulnerable.
Equally important, we are fully exposed to a roommate’s belongings, activities, habits, proclivities and way of life. This could include matter we find offensive (pornography, religious materials, political propaganda); dangerous (tobacco, drugs, firearms); annoying (jazz, perfume, frequent overnight visitors, furry pets); habits that are incompatible with our lifestyle (early risers, messy cooks, bathroom hogs, clothing borrowers). When you invite others to share your living quarters, you risk becoming a suspect in whatever illegal activities they engage in.
Government regulation of an individual’s ability to pick a roommate thus intrudes into the home, which “is entitled to special protection as the center of the private lives of our people.” Minnesota v. Carter, 525 U.S. 83, 99, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (Kennedy, J., concurring). “Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home.” Lawrence v. Texas, 539 U.S. 558, 562, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). Holding that the FHA applies inside a home or apartment would allow the government to restrict our ability to choose roommates compatible with our lifestyles. This would be a serious invasion of privacy, autonomy and security.
For example, women will often look for female roommates because of modesty or security concerns. As roommates often share bathrooms and common areas, a girl may not want to walk around in her towel in front of a boy. She might also worry about unwanted sexual advances or becoming romantically involved with someone she must count on to pay the rent.
An orthodox Jew may want a roommate with similar beliefs and dietary restrictions, so he won’t have to worry about finding honey-baked ham in the refrigerator next to the potato latkes. Non-Jewish roommates may not understand or faithfully follow all of the culinary rules., like the use of different silverware for dairy and meat products, or the prohibition against warming non-kosher food in a kosher microwave. Taking away the ability to choose roommates with similar dietary restrictions and religious convictions will substantially burden the observant Jew’s ability to live his life and practice his religion faithfully. The same is true of *1222 individuals of other faiths that call for dietary restrictions or rituals inside the home.
The U.S. Department of Housing and Urban Development recently dismissed a complaint against a young woman for advertising, “I am looking for a female Christian roommate,” on her church bulletin board. In its Determination of No Reasonable Cause, HUD explained that “in light of the facts provided and after assessing the unique context of the advertisement and the roommate relationship involved ... the Department defers to Constitutional considerations in reaching its conclusions.” Fair Hous. Ctr. of W. Mich. v. Trida, No. 05-10-1738-8 (Oct. 28, 2010) (Determination of No Reasonable Cause).
It’s a “well-established principle that statutes will be interpreted to avoid constitutional difficulties.” Frisby v. Schultz, 487 U.S. 474, 483, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). “[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.” Pub. Citizen v. U.S. Dep’t of Justice, 491 U.S. 440, 466, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (internal quotation marks omitted). Because the FHA can reasonably be read either to include or exclude shared living arrangements, we can and must choose the construction that avoids raising constitutional concerns. See INS v. St. Cyr, 533 U.S. 289, 299-300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (“[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, we are obligated to construe the statute to avoid such problems.”) (internal citation and quotations marks omitted). Reading “dwelling” to mean an independent housing unit is a fair interpretation of the text and consistent with congressional intent. Because the construction of “dwelling” to include shared living units raises substantial constitutional concerns, we adopt the narrower construction that excludes roommate selection from the reach of the FHA.
III
Because we find that the FHA doesn’t apply to the sharing of living units, it follows that it’s not unlawful to discriminate in selecting a roommate. As the underlying conduct is not unlawful, Roommate’s facilitation of discriminatory roommate searches does not violate the FHA. While Roommate itself has no intimate association right, it is entitled to raise the constitutional claims of its users. See Craig v. Boren, 429 U.S. 190, 195, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). The injunction entered by the district court precludes Roommate’s members from selecting roommates unfettered by government regulation. Roommate may therefore raise these claims on their behalf.
IV
The same constitutional concerns over the right to intimate association would arise if the California Fair Employment and Housing Act (“FEHA”) were applied to roommates. Accordingly, we interpret “housing accommodation” in section 12955(c) of the FEHA to exclude the sharing of living units. Similarly to how the FHA defines “dwelling,” the FEHA defines “housing accommodation” as “any building, structure, or portion thereof that is occupied as, or intended for occupancy as, a residence by one or more families.” Cal. Gov. Code § 12927(d). This ambiguous definition allows us to apply the canon of constitutional avoidance to find that the *1223 FEHA does not reach the selection of roommates.
In a 1995 amendment, the FEHA carved out from the definition of discrimination “the use of words stating or tending to imply that the housing being advertised is available only to persons of one sex,” “[w]here the sharing of living areas in a single dwelling unit is involved.” Cal. Gov. Code § 12927(c)(2)(B). The concurrence infers from this 1995 exemption that the statute as passed in 1974 must have covered roommates. But the acts of a subsequent legislature tell us nothing definitive about the meaning of laws adopted by an earlier legislature. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (“[Subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress.” (internal quotation marks omitted)); see also Sullivan v. Finkelstein, 496 U.S. 617, 632, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990) (Scalia, J., concurring) (“Arguments based on subsequent legislative history ... should not be taken seriously, not even in a footnote.”). The 1995 legislature may have been uncertain about whether the statute, as passed decades earlier, covered roommates, and wanted to remove any doubt that roommates could select each other by sex. But the amendment can shed no light on the meaning of “housing accommodation” in the FEHA, a statutory phrase it does not modify or reference.
Nothing in the language of the statute provides that a “housing accommodation” includes shared living quarters. Under the canon of constitutional avoidance, the interpretation of the statute need not be the best reading, so long as it’s “fairly possible.” St. Cyr, 533 U.S. at 299-300, 121 S.Ct. 2271. It is “fairly possible” that the statute does not apply to roommates. Interpreting it as excluding roommates avoids a ruling on a difficult and unexplored constitutional issue.
The concurrence also relies on a FEHC decision, but the FEHC had no authority to address the underlying constitutional problems raised by the FEHA, and thus had no reason to consider the constitutional avoidance canon: “Whether it is sound policy to ban discrimination in the selection of roommates, and whether such a policy implicates constitutional rights of privacy or association, are not questions for this decision to resolve. Those are issues for the Legislature and the courts, respectively, to decide.” Dep’t of Fair Emp’t & Hous. v. Larrick, FEHC Dec. No. 98-12, 1998 WL 750901, at *5 n. 1 (July 22, 1998). We, on the other hand, have a duty to consider constitutional concerns and to adopt an interpretation that avoids ruling on the constitutionality of a statute, if we can fairly do so. See St. Cyr, 533 U.S. at 299-300, 121 S.Ct. 2271. We are as capable as the district court in resolving the issue, which we review de novo in any event. Therefore, we see no need to remand this question to the district court.
Because precluding individuals from selecting roommates based on their sex, sexual orientation and familial status raises substantial constitutional concerns, we interpret the FHA and FEHA as not applying to the sharing of living units. Therefore, we hold that Roommate’s prompting, sorting and publishing of information to facilitate roommate selection is not forbidden by the FHA or FEHA. Accordingly, we vacate the district court’s judgment and remand for entry of judgment for defendant. Because the FHCs are no longer prevailing, we vacate the district court’s order for attorney’s fees and dismiss the cross-appeals on attorney’s fees as moot.
*1224 VACATED AND REMANDED IN PART; DISMISSED IN PART