FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FRIENDS OF THE EARTH, a Washington, D.C. non-profit corporation, on behalf of the general public; CENTER FOR FOOD SAFETY, a California non-profit corporation, on behalf of the general public, *Plaintiffs-Appellants*, <br><br> and <br><br> ORGANIC CONSUMERS ASSOCIATION, a Minnesota non-profit corporation, on behalf of the general public, *Plaintiff*, <br><br> v. <br><br> SANDERSON FARMS, INC., a Mississippi corporation, *Defendant-Appellee.* | No. 19-16696 <br><br> D.C. No. 3:17-cv-03592-RS <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted October 13, 2020
San Francisco, California

Filed March 31, 2021

Before:  M. Margaret McKeown and Jacqueline H. Nguyen, Circuit Judges, and Robert H. Whaley,[*] District Judge.

Opinion by Judge McKeown

## SUMMARY[**]

### Organizational Standing

The panel affirmed the district court's dismissal for lack of organizational standing of an action brought by two public interest groups ("Advocacy Groups") against Sanderson Farms, Inc., a major poultry producer, alleging false advertising related to the use of antibiotics.

To establish organizational standing, the Advocacy Groups needed to show that the challenged conduct frustrated their organization missions and that they diverted resources to combat that conduct. The panel held that the Advocacy Groups failed to establish standing when they failed to show a diversion of their resources to combat Sanderson's advertising.  Once Sanderson's misleading advertisements were brought to the attention of the Advocacy Groups, they simply continued doing what they were already doing – publishing reports on and informing

[*] The Honorable Robert H. Whaley, United States District Judge for the Eastern District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the public of various companies' antibiotic practices. There was no evidence of any diversion of resources.

The panel rejected the Advocacy Groups' argument that their California Unfair Competition Law claims should nevertheless move forward because they challenged Sanderson's husbandry practices, not just its advertising. The panel held that the Unfair Competition Law claim failed because it was tethered to Sanderson's advertisements.

## COUNSEL

Paige Tomaselli (argued), Greenfire Law PC, Berkeley, California; Gretchen Elsner, Elsner Law & Policy LLC, Santa Fe, New Mexico; for Plaintiffs-Appellants.

Michael A. Glick (argued), Gregg F. LoCascio, Paul J. Weeks, and Erin E. Cady, Kirkland & Ellis LLP, Washington, D.C., for Defendant-Appellee.

**OPINION**

McKEOWN, Circuit Judge:

Resolution of this appeal rests on whether two public interest groups, Friends of the Earth and Center for Food Safety (collectively, "the Advocacy Groups"), established organizational standing in their suit against Sanderson Farms, Inc., a major poultry producer, for false advertising related to the use of antibiotics.  After nearly two years of litigation and nine months of fact discovery, Sanderson challenged whether the Advocacy Groups achieved standing by diverting resources to combat the allegedly misleading representations.   In a thorough evaluation of the jurisdictional evidence, the district court dismissed the Advocacy Groups' claims for lack of organizational standing.  We affirm.

**BACKGROUND**

The missions of the Advocacy Groups relate to the protection of human health, animal health, and the environment, including reduction of the routine use of antibiotics in animal agriculture.  The Advocacy Groups advance their missions through myriad activities, including by informing consumers about the downsides of routine antibiotic use and by pressuring restaurants to stop sourcing meat from producers that routinely use antibiotics.

Though many chicken producers have stopped routine antibiotic practices, Sanderson has continued to use and defend its use of antibiotics.  Sanderson supplies its chicken to, among others, Darden Restaurants, which owns Olive Garden.  Because it purchased chickens raised by Sanderson, Olive Garden received an F grade in the Advocacy Groups' Chain Reaction reports, which rank "restaurant chains on

their antibiotic policies" and practices. On August 1, 2016, the Advocacy Groups became aware that Sanderson marketed and advertised its chicken products as "100% Natural" and ran advertisements stating that there were "[n]o antibiotics to worry about here." As part of its work to combat routine antibiotic use, Center for Food Safety linked on Facebook to an August 1, 2016 *New York Times* article about Sanderson's defense of its antibiotic use and wrote that Sanderson "lag[ged] behind many in the industry" on protecting human health and animal well-being.

The next year, the Advocacy Groups sued Sanderson under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, and False Advertising Law, *id.* § 17500 *et seq*., for false advertising about Sanderson's chicken products being "100% Natural." After the first amendment to the complaint, Sanderson moved to dismiss, raising a facial challenge to the Advocacy Groups' organizational standing. The district court denied the motion because Friends of the Earth alleged that it had devoted additional time and resources to counteract Sanderson's misrepresentations and Center for Food Safety alleged that it had diverted resources away from its government watchdog work to respond to Sanderson's advertising.

Significant discovery followed. The Advocacy Groups produced the Chain Reaction reports, press releases, social media posts, action alerts emails, petitions, and the purported costs associated with these activities. At the close of fact discovery, Sanderson again moved to dismiss, this time raising a factual challenge to the Advocacy Groups' organizational standing.

After review of the record, the district court dismissed the case for lack of subject matter jurisdiction, finding that the Advocacy Groups had not diverted resources to combat

the advertisements; rather, the activities were continuations of their ongoing work to discourage routine antibiotic use.

## ANALYSIS

## I. THE ADVOCACY GROUPS FAILED TO ESTABLISH STANDING THROUGH A DIVERSION OF RESOURCES TO COMBAT SANDERSON'S ADVERTISING

To establish organizational standing, the Advocacy Groups needed to show that the challenged conduct frustrated their organizational missions and that they diverted resources to combat that conduct. *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019). Only the diversion of resources component is at issue on appeal. Organizations divert resources when they "alter[] their resource allocation to combat the challenged practices," but not when they go about their "'business as usual.'" *Id.* (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040–41 (9th Cir. 2015)).

Diversion of resources has been found when organizations "expended additional resources that they would not otherwise have expended, and in ways that they would not have expended them." *Nat'l Council of La Raza*, 800 F.3d at 1040. This requirement was satisfied, for example, when an organization designed and disseminated literature to redress the effects of the challenged discrimination, *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002), and when an organization started new campaigns targeting discriminatory roommate preference practices, *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012). In contrast, courts have found that merely continuing ongoing activities does not satisfy this requirement. *See NAACP v. City of Kyle*, 626 F.3d 233, 238–39 (5th Cir.

2010) (holding that there was no injury sufficient for organizational standing where the resource expenditures were litigation-related or were no different than the organizations' ongoing lobbying activities); *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 78 (3d Cir. 1998) (holding that organizational standing was not satisfied where the activities were "part of the [organization]'s normal day-to-day operations").

Two temporal bookends put into perspective the timing of the advocacy here. Because the Advocacy Groups did not learn of Sanderson's alleged misrepresentations until August 1, 2016, resources expended before that date are not pertinent. And activities undertaken after suit was filed in June 2017, such as expending resources on the litigation and litigation publicity, do not confer standing. *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (noting that a plaintiff "cannot manufacture the injury by incurring litigation costs"). Nor does the theory of ongoing injury hold water if the Advocacy Groups have not established injury in the first place.

The question, then, is whether the Advocacy Groups' activities were "business as usual" and a continuation of existing advocacy, or whether they were an affirmative diversion of resources to combat Sanderson's representations. Well before August 2016, the Advocacy Groups undertook various initiatives to further their goal of reducing routine antibiotic use in animal agriculture. Since at least 2014, the mission of Friends of the Earth has entailed "encouraging buyers not to purchase meat that was raised at some point in the supply chain with routine antibiotics," and in 2015, the organization endeavored to convince Sanderson buyers to source from other suppliers. Similarly, one of the

core missions of Center for Food Safety is "limiting use of antibiotics in animal agriculture."

In examining the extensive discovery, it turns out that during the relevant period—August 2016 to June 2017—the Advocacy Groups did not publish action alerts or other advice to their members targeting the advertising; did not address Sanderson's advertising in any campaign, press release, blog post, or other communication; did not petition Sanderson; and did not protest Sanderson's advertising. This notable absence of evidence led the district court to conclude that the Advocacy Groups "failed to produce evidence demonstrating they expended additional resources to address Sanderson's advertisements, as opposed to its practices."[1]   Once Sanderson's misleading advertisements were brought to the attention of the Advocacy Groups, they simply continued doing what they were already doing— publishing reports on and informing the public of various companies' antibiotic practices.   This evidentiary void cannot be filled by emails in which the Advocacy Groups' employees shared articles about Sanderson's practices and deceptive advertisements, querying internally whether something should be done; evidence of any diversion of resources remains missing.

The Advocacy Groups attempted to distinguish Sanderson-related expenditures from ongoing activities by pointing to post-discovery information offered by their designated representatives, Marcelin Keever and Rebecca

---

[1] Although the Advocacy Groups make much of this statement, we do not read the district court to have *required* the Advocacy Groups to mention Sanderson's advertisements.   Rather, the lack of any such reference supported the district court's finding regarding the absence of evidence of diverted resources.

Spector. Keever stated that "because of [Sanderson's] . . . advertising . . . , Friends of the Earth used its Facebook account to publicize the truth about antibiotics and chicken . . . ." Spector offered that because of Sanderson's advertising, Center for Food Safety had to provide greater detail in its publications and changed its tone in one of its blog posts. She asserted that Sanderson's advertising led to a Center for Food Safety employee spending "at least 25 percent more time educating the public about why [Sanderson]'s advertising, specifically its messaging on antibiotics, was misleading and 25 percent less time on federal policy work."

The earlier depositions of these representatives told a different story. Keever admitted that Friends of the Earth's advocacy activities were not "because of" Sanderson's advertising, and Spector admitted that the advertising did not "require [Center for Food Safety] to do anything at all." And more damning was the admission by Friends of the Earth that, even without the advertising, the organization would have continued its pressure campaign to get restaurants to switch from Sanderson as a supplier. The district court laid out the previous "damaging" testimony where the Advocacy Groups admitted that "they did not divert resources because of Sanderson's advertising and state[d] they would have undertaken the same advocacy activities—including advocating against the use of antibiotics in animal agriculture and discouraging consumers from purchasing meat raised with routine antibiotics—even if Sanderson had never aired the challenged advertisements."

The court homed in on the two declarations because of the conflict with the depositions and the other discovery, and because none of the other evidence supported a traceable link between the challenged advertisements and the

advocacy activities.  The district court found "suspect" the claim about a staff member spending 25% more time because of Sanderson's advertising and found the figure "uncorroborated in the record."  The district court referenced the sham affidavit rule in passing and concluded that "[t]he Keever and Spector Declarations, to the extent they allege Plaintiffs[] diverted resources to address Sanderson's advertisements, are wholly inconsistent with Plaintiffs' deposition testimony, and their apparent explanation for this discrepancy (namely, to clarify their prior deposition testimony), is untenable."

The Advocacy Groups dispute the district court's approach to resolving the conflicting evidence, arguing that it erred in not applying the stringent requirements of the sham affidavit rule or in not holding an evidentiary hearing. The court's perspective, however, was consistent with the rules governing a factual challenge to standing under Rule 12(b)(1).   Once Sanderson contested "the truth of the plaintiff[s'] factual allegations," the Advocacy Groups had the burden to "support [their] jurisdictional allegations with 'competent proof,'" *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010)), and, of course, had the burden of establishing subject matter jurisdiction.  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("[T]he party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.").   Importantly, because the jurisdictional disputes were not intertwined with the merits of the claim and because "the existence of jurisdiction turn[ed] on disputed factual issues," it fell to the district court to "resolve those factual disputes itself."   *Leite*, 749 F.3d at 1121–22, 1122 n.3.  Indeed, that is exactly what the district court did, and we review its factual findings for

clear error. *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008).

The district court's reference to the sham affidavit rule does not change our conclusion. On a summary judgment motion, the sham affidavit rule permits courts to set aside contradictory testimony, provided certain conditions are met. *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012). The rule is "'applied with caution' because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Id.* (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009)).

Notably, a factual jurisdictional challenge under Rule 12(b)(1) does not provide the same framework or procedural protections for plaintiffs as review at summary judgment. *See Kingman Reef*, 541 F.3d at 1195; *CNA v. United States*, 535 F.3d 132, 140 (3d Cir. 2008) (recognizing that review at summary judgment provides more procedural protections for plaintiffs than does review under Rule 12(b)(1), because under Rule 12(b)(1) the district court "may independently evaluate the evidence regarding disputes over jurisdictional facts"); *Morrison v. Amway Corp.*, 323 F.3d 920, 924–25 (11th Cir. 2003) (similar). Thus, in resolving factual disputes going to jurisdiction, the district court was not required to follow the strictures of the sham affidavit rule.

After nearly two years and mountains of discovery, the Advocacy Groups could meaningfully offer only a single conclusory, contradictory, and uncorroborated statement as evidence of diverted resources. The district court weighed the evidence and concluded that the various activities proffered by the Advocacy Groups "were continuations of non-Sanderson-specific initiatives [the Advocacy Groups] were undertaking in furtherance of their missions to address

antibiotic use generally."   We discern no error in that conclusion.  *See Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 728 (9th Cir. 1997) ("A district court has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." (internal quotation marks omitted)).

## II.  THE UCL CLAIM FAILS BECAUSE IT IS TETHERED TO SANDERSON'S ADVERTISEMENTS

The Advocacy Groups argue that their UCL claim should nevertheless move forward because they challenged Sanderson's husbandry practices—not just its advertising. This argument fails.  Throughout the litigation, and as the Advocacy Groups acknowledged at oral argument, all parts of the UCL claim have related to Sanderson's *representations* of its chicken products as "100% Natural." Thus, the husbandry practices are not relevant in their own right, but only as related to the claimed misrepresentations. For this reason, the UCL claim is entirely tethered to the representations.  Consequently, no claim survives dismissal.

**AFFIRMED.**