FILED
United States Court of Appeals
Tenth Circuit

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

April 6, 2026

Christopher M. Wolpert
Clerk of Court

_____

HOMEROOM, INC.; VAL FRENCH,

    Plaintiffs - Appellants,

v.

CITY OF SHAWNEE, KANSAS;
DOUGLAS GERBER; KEVIN
MESSICK,

    Defendants - Appellees.

No. 23-3168
(D.C. No. 2:23-CV-02209-HLT-GEB)
(D. Kan.)

_____

## ORDER AND JUDGMENT*
_____

Before **CARSON**, **ROSSMAN**, and **FEDERICO**, Circuit Judges.
_____

This appeal arises out of Appellee City of Shawnee's Ordinance
No. 3419, which limits the number of unrelated people who can live together
in Shawnee, Kansas. Appellants HomeRoom, Inc., a property management
company, and Val French, a private citizen, sued the City under 42 U.S.C.
§ 1983 alleging the Ordinance violates their Fourteenth Amendment rights
to intimate association and equal protection. The City moved to dismiss the

_____

* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be
cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion.[1] Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**[2]

In April 2022, the City adopted Ordinance No. 3419. The Ordinance defines "Co-Living Group" as "a group of four (4) or more unrelated persons age eighteen (18) or older living together in a dwelling unit, provided that if any one (1) of the adult persons is unrelated to another adult person in the group, the entire group shall be classified as unrelated." RI.10, ¶ 26 (internal quotation marks omitted). According to the Ordinance, "related persons" means "(A) Persons related by blood, marriage, adoption, or guardianship; or (B) A person having legal custody of a minor or the designee of a parent or other person having legal custody of a minor." RI.10, ¶ 27 (internal quotation marks omitted). The Ordinance prohibits Co-Living Groups in every

---

[1] The complaint also named two City employees as individual defendants. The district court dismissed the claims against those defendants as duplicative of the claims against the City. Appellants do not challenge that portion of the district court's decision.

[2] Because the appeal before us concerns a motion to dismiss, we take these facts from Appellants' complaint. *See, e.g.*, *Matney* v. *Barrick Gold of N. Am.,* 80 F.4th 1136, 1141 & n.1 (10th Cir. 2023) (relying on facts in the complaint to describe the background when appeal involves challenge to a district court's order granting a motion to dismiss).

residential-use zone in the City. It applies whether the residence is rented or owner-occupied. The City has established a pattern and practice of enforcing the Ordinance. The Ordinance imposes no occupancy limit for related individuals.

When the City adopted the Ordinance, Ms. French lived in a house that she owned along with her husband, their two adult sons, and the girlfriend of one of the sons.[3] The girlfriend was not related to anyone in the house by blood, marriage, or adoption. The entire household was "unrelated" under the Ordinance and thus exceeded the dwelling limit, which prohibits four or more unrelated persons from living together. Because of the Ordinance, Ms. French's son and his girlfriend had to move out of her house, and Ms. French could not rent the spare room to any other tenant.

HomeRoom is a property management startup company. It helps connect property owners to residential renters and facilitates low-cost housing searches for those looking for co-living situations. HomeRoom manages two

---

[3] The complaint does not allege Ms. French lives in Shawnee; rather, it simply states she is a "private citizen," RI.7, ¶ 9, who "lives in a home that she owns," RI.12, ¶ 36. But because she alleges the Ordinance prevents her from having additional unrelated people living with her, *see, e.g.,* RI.8, ¶ 16, we draw the reasonable inference that she lives in Shawnee. *See Matney* v. *Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023) (explaining when reviewing the dismissal of a complaint under Rule 12(b)(6), "we accept the well-pleaded facts alleged as true and view them in the light most favorable to the plaintiff").

3

residential properties in Shawnee owned by investors. HomeRoom is the "master tenant" for each property. RI.11, ¶ 30. Before the City enacted the Ordinance, HomeRoom would sublet the homes to unrelated roommates. At the February 28, 2022, meeting of the Shawnee City Council, where the Ordinance was formally discussed, the Community Development Director stated, "that HomeRoom model that's a new phenomenon, from the new economy I guess, we need to decide if . . . it's something that you even want to consider in our single-family zones." RI.10–11, ¶ 28 (internal quotation marks omitted). Since the Ordinance was enacted, HomeRoom has been forced to evict its unrelated tenants, and it now sublets the properties only to blood-related families.

HomeRoom and Ms. French challenged the Ordinance in federal district court. On May 9, 2023, they filed a complaint under 42 U.S.C. § 1983 alleging facial violations of substantive due process and equal protection under the Fourteenth Amendment. "The Ordinance invades the intimate associations of Shawnee residents," Appellants alleged, "by regulating their household composition in a manner bearing no relation to any legitimate police power aim." RI.13, ¶ 44. They also claimed the Ordinance "creates a facially discriminatory classification" by distinguishing between those who are "related to all members of their household" and those who are "not so related to all members of their household." RI.14, ¶ 52. The complaint also alleged a state

claim under the Kansas Zoning Enabling Act. And it sought declaratory and injunctive relief.

The City moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). HomeRoom's "claim fails at the outset because HomeRoom is a corporate entity, and has no constitutionally protected right to enter or maintain intimate *human* relationships in the first place," the City argued, "[n]or can HomeRoom assert a constitutional claim on behalf of any putative Co-Living Group of its sublessees." RI.85. Regarding Ms. French, the City asserted "no relationship protected by the Fourteenth Amendment is implicated by [Ms.] French's claims regarding the Ordinance's impact on her relationship with either her son's girlfriend or any other unrelated tenant she ma[y] desire to rent a room to." RI.87.

Even assuming either plaintiff "could establish that their claim implicated a constitutionally protected relationship," RI.87, the City argued "the Ordinance does not place a direct and substantial burden on the right to intimate familial association and is subject to rational basis scrutiny," RI.88. The City principally relied on *Village of Belle Terre* v. *Boraas*, 416 U.S. 1 (1974), and argued that case dictated the outcome here. RI.89. Under *Belle Terre*, the City argued "maintaining the single-family character of neighborhoods—the obvious underlying purpose of the Ordinance—is a legitimate public interest that survives rational basis scrutiny." RI.90.

5

Because the Ordinance survives rational basis scrutiny, the City maintained that the due-process and equal-protection claims failed as a matter of law. The claim for declaratory relief under the Kansas Enabling Act also failed, the City explained, because the City had the authority to enact the Ordinance.

The district court granted the motion to dismiss in a written order. The district court agreed with the City that HomeRoom is a corporate entity with no constitutionally protected right of intimate association. To the extent HomeRoom is separately asserting the rights of its would-be unrelated tenants, prudential limitations on standing required dismissal of HomeRoom's constitutional claims. The district court then reached the merits of Ms. French's constitutional claims and dismissed them, agreeing with the City that the Ordinance "does not violate substantive due process or the Equal Protection clause based on the authority of *Belle Terre*." RI.126. Given its disposition on the federal claims, the district court declined to exercise supplemental jurisdiction over the remaining state-law claim.

This timely appeal followed.

## II

We review *de novo* a district court's decision to dismiss a complaint under Rule 12(b)(6). *StreetMediaGroup, LLC* v. *Stockinger*, 79 F.4th 1243, 1248 (10th

6

Cir. 2023). "In reviewing an order granting a motion to dismiss, our role is like the district court's: we accept the well-pleaded facts alleged as true and view them in the light most favorable to the plaintiff." *Matney* v. *Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023) (internal quotation marks and ellipsis omitted).

Appellants urge reversal, reprising their arguments that the Ordinance is facially unconstitutional. Appellants also challenge the district court's conclusion that HomeRoom lacks prudential standing. We discern no error in the district court's decision to dismiss the complaint. We begin by discussing standing and then turn to the merits of the appellate arguments.

### A

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Kowalski* v. *Tesmer*, 543 U.S. 125, 128 (2004) (internal quotation marks omitted). "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975). Article III standing has three elements: 1) an injury in fact, which is "an invasion of a legally protected interest"; 2) a causal connection between the injury and the challenged action of the

defendant; and 3) a likelihood that the injury will be redressed by a favorable decision. *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

But "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement," the Supreme Court has explained, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth,* 422 U.S. at 499. "This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Kowalski*, 543 U.S. at 129. There are some limited exceptions to this rule. "[I]n several cases [the Supreme Court] has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Id.* at 130 (quotation omitted). "[T]he prudential rules of standing . . . serve to limit the role of the courts in resolving public disputes." *Warth*, 422 U.S. at 500.

When plaintiffs assert standing based on the rights of third parties, the court may "assume [the plaintiffs] have satisfied Article III and address the alternative threshold question whether [the plaintiffs] have standing to raise the rights of others." *Kowalski*, 543 U.S. at 129. Relatedly, if there are multiple plaintiffs, a court "need not decide whether the circumstances of

8

[the] case would justify departure from [the] prudential limitation" on asserting third parties' rights, if there is "at least one individual plaintiff who has demonstrated standing to assert [the] rights as his own." *Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263, 264 (1977) (*MHDC*). In that situation, the court can address the merits of the claims based on the individual plaintiff with standing, and "need not consider whether the other . . . plaintiffs have standing to maintain the suit." *Id.* at 264 & n.9.

**B**

With these guiding principles in mind, we turn to the circumstances in this case. Recall, the district court ruled HomeRoom, a corporate entity, has no constitutionally protected right of intimate association. And as to HomeRoom's claims asserting the rights of its would-be tenants, the district court held "prudential limitations on standing" required dismissal.[4] RI.122.

On appeal, Appellants do not contest the district court's conclusion that HomeRoom has no constitutionally protected right of intimate association because of its corporate nature. They focus their argument on HomeRoom's standing to assert the rights of third parties. Appellants

---

[4] The City did not challenge Ms. French's standing in district court, and the district court addressed the merits of her constitutional claims, as do we.

contend HomeRoom meets an exception to the prudential concern against permitting a party to assert the rights of others. Op. Br. at 9–10. The City disputes HomeRoom's contention.

We need not decide, however, if HomeRoom has prudential standing because this case involves multiple plaintiffs, and one of the plaintiffs— Ms. French—undisputedly has standing to assert her claims. *See MHDC*, 429 U.S. at 263, 264. Appellants acknowledge as much, stating, "as in *MHDC*, HomeRoom brings this suit with a co-plaintiff[, Ms. French,] who unquestionably has standing to assert the claims involved." Reply Br. at 7. When asked about standing at oral argument, Appellants' counsel reiterated Ms. French had standing, and conceded the court did not need to go further than Ms. French on the question of standing.[5]

Accordingly, we proceed to consider the merits of Ms. French's constitutional claims.[6]

---

[5] Appellants' counsel explained: "Out of a duty of advocacy for my client HomeRoom, these kind of issues come up in other jurisdictions, they may try to advance these rights in other circuits and so you know we'd like a decision that confirms they do have standing to bring these sorts of claims. But . . . the case can proceed to the merits without HomeRoom's standing." Recording of Oral Argument, September 26, 2024, at 2:17–2:35.

[6] We note that Appellants' complaint brought a facial challenge to the constitutionality of the Ordinance, not an as-applied challenge. "A facial challenge considers the [ordinance's] application to all conceivable parties, while an as-applied challenge tests the application of that [ordinance] to the facts of a plaintiff's concrete case." *StreetMediaGroup, LLC*, 79 F.4th at

## III

In the district court, Ms. French alleged the Ordinance was facially unconstitutional because it violated her substantive due-process right to intimate association and her right to equal protection. Recall, the Ordinance limits to three the number of unrelated people who can live together. The district court rejected Ms. French's constitutional challenges and dismissed her claims, concluding the Ordinance "does not violate substantive due process or the Equal Protection clause based on the authority of *Belle Terre*."[7] RI.126. We discern no error.

---

1248 (internal quotation marks omitted). Appellants' request for relief is a judgment declaring the Ordinance is unconstitutional, and a permanent injunction prohibiting the City from enforcing it. Given these circumstances, as a practical matter, were Ms. French to prevail in this litigation, HomeRoom would receive the benefit of the Ordinance being declared unconstitutional.

[7] In response to the motion to dismiss, Ms. French stated that "[t]he substantive thrust of [her] claims under Due Process of Law and Equal Protection are closely related," so she presented analysis "pertaining to both claims together." RI.96 & n.2. Consistent with the presentation of Ms. French's claims in her response, the district court analyzed the claims together. *See* RI.123–126. Likewise, Ms. French addressed the claims together in her appellate briefing. *See* Op. Br. at 25–32; Reply Br. at 9–19. Because she presented her constitutional claims in this way, we will not disaggregate them for her.

**A**

*Belle Terre* is central to the district court's analysis and our disposition, so we begin by describing that opinion in detail. In *Belle Terre*, 416 U.S. at 2–3, the Supreme Court considered a challenge to a zoning ordinance that restricted land use to single-family dwellings, defined family as one or more persons related by blood, adoption or marriage, and limited the number of unrelated people who could live together to two. The plaintiffs—six unrelated students at a nearby university who were living together—were served with a notice that they violated the ordinance. *Id.* They sued seeking "an injunction and a judgment declaring the ordinance unconstitutional." *Id.* at 3.

Discussing its prior zoning cases, the Court emphasized a degree of deference is generally owed to governing bodies on zoning legislation. "If the validity of the legislative classification for zoning purposes [is] fairly debatable," the Supreme Court explained, "the legislative judgment must be allowed to control." *Id.* at 4 (internal quotation marks omitted); *id.* at 5–6 (explaining it is within the power of the legislature to determine whether the public welfare may be enhanced by zoning regulations).

The Court then turned to the ordinance before it, recognizing the argument "that if two unmarried people can constitute a 'family,' there is no reason why three or four may not." *Id.* at 8. But it explained, "every line drawn by a legislature leaves some out that might well have been included." *Id.* There,

12

the line drawing was not based on a suspect classification like race, involved no fundamental right guaranteed by the Constitution—such as "the right of association" or "any rights of privacy," and involved no procedural disparity inflicted on some but not others. *Id.* at 6-7. "A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs." *Id.* at 9. Such a goal is a permissible one within the police power of the state, the Court held. *Id.*; *see also id.* at 8 (observing "that exercise of discretion . . . is a legislative, not a judicial function").

Justice Marshall dissented because in his view "the disputed classification [between households of related and unrelated individuals] burdens the students' fundamental rights of association and privacy guaranteed by the First and Fourteenth Amendments."[8] *Belle Terre*, 416 U.S. at 13 (Marshall, J. dissenting). According to Justice Marshall, the Court's decisions "establish[ed] that the First and Fourteenth Amendments protect the freedom to choose one's associates" and "[c]onstitutional protection is extended, not only to modes of association that are political in the usual sense, but also

---

[8] Justice Brennan also dissented but for a different reason. In his view, there was no longer an active case or controversy because "[t]he constitutional challenge . . . [was] premised solely on alleged infringement of associational and other constitutional rights of tenants," but the named tenant appellees no longer lived in the house. *Belle Terre,* 416 U.S. at 10 (Brennan, J. dissenting).

to those that pertain to the social and economic benefit of the members." *Id.* at 15. "The selection of one's living companions involves similar choices as to the emotional, social, or economic benefits to be derived from alternative living arrangements," he explained. *Id.* And he further observed "[t]he freedom of association is often inextricably entwined with the constitutionally guaranteed right of privacy." *Id.* He therefore concluded "[t]he choice of household companions . . . involves deeply personal considerations as to the kind and quality of intimate relationships within the home. That decision surely falls within the ambit of the right to privacy protected by the Constitution." *Id.* at 16.

**B**

On appeal, Ms. French challenges the district court's decision to dismiss her constitutional claims under *Belle Terre*. She acknowledges the Supreme Court in *Belle Terre* "considered an ordinance, which like the Ordinance at issue here, restricted the number of unrelated persons who may live together in a single residence." Op. Br. at 12. But she seeks distance from that case, contending it does not control the outcome here. She argues "subsequent developments in the law have cast serious doubt on the continuing viability of *Belle Terre*," Op. Br. at 12, and "*Belle Terre* did not consider the right of intimate association," Op. Br. at 17. Neither argument is availing, as we explain.

14

1

Ms. French argues "*Belle Terre*'s authority has been greatly diminished by subsequent jurisprudence." Op. Br. at 13 (boldface omitted). In support, she first relies on state-court decisions. *See* Op. Br. at 13. (citing cases from state courts in New Jersey, California, and Michigan). But these authorities are not helpful to her position. As the City correctly argues, "*Belle Terre* is not binding on state courts, which are free to interpret state constitutions and statutes more stringently than the Supreme Court." Resp. Br. at 28–29.

Ms. French also points to federal case law, suggesting these authorities show a jurisprudential shift away from *Belle Terre*, but those cases are likewise unhelpful. She first cites *Moore* v. *City of East Cleveland*, 431 U.S. 494 (1977), which involved the constitutionality of an ordinance limiting occupancy of a dwelling unit to members of a single family, but containing a definition of family that recognized "only a few categories of related individuals." *Id.* at 495–96. Although the City of East Cleveland argued *Belle Terre* required the Court to sustain the ordinance, the Supreme Court rejected that argument. The Court explained, "one overriding factor sets this case apart from *Belle Terre*"—"[t]he ordinance there affected only unrelated individuals." *Id.* at 498. In contrast, the ordinance in *Moore* "selects certain categories of relatives who may live together and declares that others may not." *Id.* at 498–99. The Court determined, "[w]hen a City undertakes such intrusive regulation of the family,

15

neither *Belle Terre* nor *Euclid* [v. *Ambler Realty Co.*, 272 U.S. 365 (1926),] governs." *Id.* at 499.

Ms. French seems to suggest *Moore* diminishes the authority of *Belle Terre* because "the Court highlighted the weakness of the same government rationale it had validated in *Belle Terre*, observing that the ordinance had only a 'marginal' and 'tenuous' relationship with the expressed goals of maintaining a quiet residential neighborhood." Op. Br. at 14 (quoting *Moore*, 431 U.S. at 499–500). We are not persuaded. *Moore* involved an ordinance that limited the types of *related* people who could live together by narrowly defining family; it does not impact the analysis here, where the Ordinance restricts the number of *unrelated* people who may live together. *Moore* distinguished rather than diminished *Belle Terre*.

Ms. French next cites *City of Cleburne* v. *Cleburne Living Center*, 473 U.S. 432 (1985). She argues "[t]he reasoning of *Belle Terre* was further subverted—and, indeed, replaced wholesale—in *Cleburne*." Op. Br. at 14. Again, we cannot agree.

In *Cleburne*, the Supreme Court considered a challenge to an ordinance that required a special-use permit to develop a group home for "the mentally retarded," but did not require special-use permits for other types of group homes. 473 U.S. at 447–48. The question in *Cleburne* was "whether it [was] rational to treat the mentally retarded differently." *Id.* at 449. The Court

16

reasoned that "requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded" because the "record does not clarify how . . . the characteristics of the intended occupants of the [group] home rationally justify denying to those occupants what would be permitted to groups occupying the same site for different purposes." *Id.* at 450.

Ms. French contends *Cleburne* "stands for the proposition that zoning ordinances which discriminate based on the status or identity of land users call for a more searching review than the one applied in *Belle Terre.*" Op. Br. at 16. The City responds "*Cleburne* is factually inapposite to the situation at hand," *see* Resp. Br. at 24, and *Cleburne* did not announce "a more exacting standard of rational basis review," Resp. Br. at 25. We agree with the City.

*First*, we reject Ms. French's assertion that *Cleburne* calls for a more "searching form of rational basis review," Op. Br. at 28. As the City correctly observes, the Supreme Court has never stated that *Cleburne* employed a different type of rational-basis review. *See* Resp. Br. at 25 (citing *Powers* v. *Harris*, 379 F.3d 1208, 1224 (10th Cir. 2004)). In *Powers*, we explained "no majority of the Court has stated that the rational-basis review found in *Cleburne* . . . differs from the traditional variety." 379 F.3d at 1223–24.

*Next*, the City emphasizes the critical factor in *Cleburne*, not present in *Belle Terre* or in this case, was the zoning regulation differentiated between different types of unrelated people. We agree with the City that *Cleburne* is

17

factually inapposite to the situation here because the Ordinance does not treat different types of unrelated people differently.

*Finally,* the Supreme Court mentioned *Belle Terre* only once in *Cleburne* in a footnote, and it made clear *Belle Terre* remained controlling where zoning regulations distinguish between families and unrelated people. *See* 473 U.S. at 439 n.8. Federal courts post-*Cleburne* continue to recognize *Belle Terre* as governing authority on ordinances that place occupancy limits on the number of unrelated people living together. *See*, *e.g.*, *Doe* v. *City of Butler,* 892 F.2d 315, 320–21 (3d Cir. 1989) (citing *Belle Terre*, applying rational-basis review to a due-process challenge to a zoning regulation limiting transitional dwellings to six unrelated people, and upholding the regulation); *Jones* v. *Wildgen*, 320 F. Supp. 2d 1116, 1131–32 (D. Kan. 2004) (citing *Belle Terre*, applying rational-basis review to an equal-protection challenge to a zoning ordinance limiting occupancy of a rental dwelling to three unrelated persons, and upholding the ordinance).

## 2

Ms. French next contends the district court erred in relying on *Belle Terre* because that case did not consider the right of intimate association. She asserts "[t]he most important development undermining *Belle Terre*, for the purposes of this case, is the explicit recognition of the right of intimate association first announced in *Roberts* [v. *U.S. Jaycees*, 468 U.S. 609 (1984)]."

18

Op. Br. at 17. According to Ms. French, *Roberts* "establishes that certain associations are so intimate as to receive 'fundamental' constitutional protection." Op. Br. at 19. She therefore asserts "zoning ordinances which burden the right of intimate association are subject to the strict scrutiny reserved for fundamental rights."[9] Op. Br. at 19. She also reprises her argument—which the district court rejected—that *Fair Housing Council of San Fernando Valley* v. *Roommate.com, LLC*, 666 F.3d 1216 (9th Cir. 2012), *overruled in part on other grounds by FDA* v. *Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), is instructive because it recognized the constitutional significance of the roommate relationship. We disagree.

**a**

*Roberts* did not alter the legal framework for analyzing zoning ordinances as established in *Belle Terre*. In *Roberts*, the Court was considering "a conflict between a State's efforts to eliminate gender-based discrimination against its citizens and the constitutional freedom of association asserted by members of a private organization." 468 U.S. at 612. The Court outlined factors that might be relevant when "[d]etermining the limits of state authority over

---

[9] Ms. French includes a citation to *Petrella* v. *Brownback*, 787 F.3d 1242, 1261 (10th Cir. 2015). *See* Op. Br. at 19. But *Petrella* did not involve a challenge to a zoning ordinance; the citation to *Petrella* appears to be for the general proposition that "[w]hen a plaintiff demonstrates that a challenged law burdens a fundamental right, courts apply strict scrutiny in assessing the validity of the law." 787 F.3d at 1261.

an individual's freedom to enter into a particular association." *Id.* at 620. These factors help assess where a "relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments" and include "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Id.* The Court ultimately declined to extend constitutional protection to the U.S. Jaycees—a non-profit educational company that wanted to exclude women from membership, reasoning that large and unselective groups are not the sort of private intimate associations warranting protection. *See id.* at 620–21. *Roberts*, therefore, does not inform our constitutional analysis of the Ordinance here. [10]

Ms. French insists *Roberts* "vindicated" Justice Marshall's dissent in *Belle Terre*. Op. Br. at 18. But *Roberts* did not mention *Belle Terre*. Justice Marshall's dissenting view was the ordinance in *Belle Terre* "unnecessarily burden[ed]" the petitioners' constitutional rights of "freedom of association and . . . right to privacy," 416 U.S. at 15 (Marshall, J. dissenting).

---

[10] Although Ms. French wants us to apply the factors outlined in *Roberts, see* Op. Br. at 22–23, there is no federal court that has done so in the context of a zoning ordinance. We also note the Supreme Court issued *Cleburne* after *Roberts*. The Court therefore had the opportunity in *Cleburne* to say *Belle Terre* no longer controls or to apply *Roberts* to a zoning ordinance case involving the rights of unrelated people to live together, but it did not do so.

Although *Roberts* explicitly recognized the right of intimate association for the first time, it relied on preexisting Supreme Court precedent to do so.[11] Notably, the Third Circuit, when considering the right of association in the context of a zoning ordinance after *Roberts*, explained "[n]othing in *Roberts* suggests that the Court's prior opinion in *Belle Terre*, which explicitly rejected a right of association claim in a zoning context, *see* 416 U.S. at 7, . . . is no longer governing authority." *Doe*, 892 F.2d at 323.

**b**

Ms. French also asserts the Ninth Circuit's decision in *Roommate.com*, is "instructive," Op. Br. at 23, and argues the Ninth Circuit recognized in that case "the right to freely associate with household living companions," "is an obvious candidate for a fundamental associational right," Reply Br. at 10. But

---

[11] Ms. French has not meaningfully explained why parsing between expressive and intimate association is necessary when these rights are analyzed the same doctrinally. As we have previously discussed:

> We believe that freedom of expressive association provides the most appropriate analogy for freedom of intimate association. As the Court noted in [*Roberts* v. *U.S.*] *Jaycees,* '[t]he intrinsic and instrumental features of constitutionally protected association may, of course, coincide.' 104 S. Ct. at 3249. These common features and values may best be safeguarded by similar doctrinal analysis. Despite different constitutional roots, both interests protect interpersonal relationships from unwarranted intrusion by the state.

*Trujillo* v. *Bd. of Cnty. Comm'rs*, 768 F.2d 1186, 1189–90 (10th Cir. 1985).

21

the City responds "*Roommate.com* does not discuss, much less recognize, that the right to intimate association encompasses a right to reside with any number of unrelated adults." Resp. Br. at 19. And the City further asserts, "as the district court recognized, the issues in *Roommate.com* differ materially from the ones in this case." Resp. Br. at 19. We again agree with the City.

*Roommate.com* speaks to the heightened importance of relationships between unrelated individuals in the roommate context,[12] but it is not useful to the constitutional inquiry before us. There, the Ninth Circuit considered whether "[Roommate.com's] questions requiring disclosure of sex, sexual orientation and familial status, and its sorting, steering and matching of users based on those characteristics, violate the Fair Housing Act (FHA)." 666 F.3d at 1218. Relying on the doctrine of constitutional avoidance, the Ninth Circuit declined to read the FHA as applying to shared living units because doing so would "raise[] substantial constitutional concerns" and "would be a serious invasion of privacy, autonomy and security." *Id.* at 1221–22. The court of appeals instead "adopt[ed] the narrower construction that exclude[d]

---

[12] The Ninth Circuit observed: "Aside from immediate family or a romantic partner, it's hard to imagine a relationship more intimate than that between roommates, who share living rooms, dining rooms, kitchens, bathrooms, even bedrooms. Because of a roommate's unfettered access to the home, choosing a roommate implicates significant privacy and safety considerations." 666 F.3d at 1221.

roommate selection from the reach of the FHA." *Id.* at 1222. Notably, *Roommate.com* never discussed *Belle Terre.*

The district court appropriately rejected Ms. French's reliance on *Roommate.com*, explaining "the issue in *Roommate.com* (whether the FHA should be read to interfere with relationships inside a home) was different than the issue here and in *Belle Terre* (whether municipalities can limit unrelated people living in a residence under zoning authority)." RI.126. Ms. French fails to explain why the district court's reasoning is wrong.

In sum, *Belle Terre* remains dispositive precedent on the issue in this appeal: the constitutionality of a zoning ordinance that places occupancy limits on unrelated people living together. Ms. French has presented no contrary persuasive argument. As the district court acknowledged, Ms. French certainly has "a right to argue for a change in the law, but *Belle Terre* remains good law and is binding authority" on the district court and this court. RI.125; *Rodriguez de Quijas* v. *Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (instructive that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

## IV

Finally, Ms. French argues "[e]ven if the Ordinance were not subject to strict scrutiny as a violation of the fundamental right of intimate association, it would still fail under the searching form of rational basis review outlined in *Cleburne*." Op. Br. at 28. But as discussed, *Cleburne* did not disturb the traditional rational-basis standard.

Following the reasoning in *Belle Terre*, the Ordinance does not involve a fundamental right nor does it categorize people based on a suspect classification. *See Belle Terre*, 416 U.S. at 6, 7–8. We therefore apply rational-basis review, like the Supreme Court did in *Belle Terre*. *See id.* at 8. As the district court aptly summarized, the ordinance in *Belle Terre* "involved no fundamental rights guaranteed by the Constitution," so the Supreme Court "applied rational basis scrutiny," found "that limiting the number of unrelated people to two was a proper exercise of legislative discretion," and "deemed the ordinance constitutional." RI.123. So too here. Appellants have presented no availing argument that the Ordinance here, which is almost identical to the one the Supreme Court upheld in *Belle Terre*, does not survive rational-basis review. *See Seegmiller* v. *LaVerkin City*, 528 F.3d 762, 772 (10th Cir. 2008) ("Our rational basis review is highly deferential toward the government's actions."); *see also Copelin-Brown* v. *N.M. State Pers. Off.*, 399 F.3d 1248, 1255 (10th Cir. 2005) (explaining a court will uphold a policy under rational-basis

24

review "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" (internal quotation marks omitted)).

**V**

We affirm the district court's judgment.[13]

Entered for the Court

Veronica S. Rossman
Circuit Judge

---

[13] Because we affirm the dismissal of Ms. French's federal claims, we also affirm the district court's decision to decline to exercise supplemental jurisdiction over her state-law claim. *See Nielander* v. *Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1172 (10th Cir. 2009) ("Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").