Filed 7/16/21; See concurring opinions

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TAKING OFFENSE,<br><br>      Plaintiff and Appellant,<br><br>  v.<br><br>STATE OF CALIFORNIA,<br><br>      Defendant and Respondent. | C088485<br><br>(Super. Ct. No. 34-2017-80002749-CU-WM-GDS) |

APPEAL from a judgment of the Superior Court of Sacramento County, Steven M. Gevercer, Judge. Reversed in part and affirmed in part.

Llewellyn Law Office and David Llewellyn, Jr., for Plaintiff and Appellant.

Matthew Rodriquez, Attorney General, Thomas S. Patterson, Senior Assistant Attorney General, Tamar Pachter and Paul Stein, Supervising Deputy Attorneys General, Anna T. Ferrari, Deputy Attorney General, for Defendant and Respondent.

1

In 2017 the California Legislature enacted Senate Bill No. 219 (2017-2018 Reg. Sess.), which added to the Health and Safety Code the Lesbian, Gay, Bisexual, and Transgender (LGBT) Long-Term Care Facility Residents' Bill of Rights. (Stats. 2017, ch. 483, §§ 1-4.) Petitioner Taking Offense, an "unincorporated association which includes at least one California citizen and taxpayer who has paid taxes to the state within the last year," sought a writ of mandate asserting facial challenges to two provisions of Senate Bill No. 219. The first, codified in Health and Safety Code section 1439.51, subdivision (a)(5), prohibits staff members of long-term care facilities from willfully and repeatedly referring to a facility resident by other than the resident's preferred name or pronoun when clearly informed of the name and pronoun.[1] Taking Offense challenges that provision on the bases that it violates staff members' rights to free speech, free exercise of religion, and freedoms of thought and belief, and is vague and overbroad. As we will explain, we agree with Taking Offense that section 1439.51, subdivision (a)(5), to which we refer as the pronoun provision, is a content-based restriction of speech that does not survive strict scrutiny.

The second challenged provision, section 1439.51, subdivision (a)(3), makes it unlawful for long-term care facilities or facility staff to assign, reassign, or refuse to assign rooms, where such decisions are based on gender, other than in accordance with a transgender resident's gender identity, unless at the transgender resident's request. Taking Offense challenges the provision as a violation of non-transgender residents' right to equal protection under the law, contending non-transgender residents are not afforded the same opportunity to request a roommate who does not conform to the resident's gender identity. We disagree that section 1439.51, subdivision (a)(3), to which we refer

---

[1] Further undesignated statutory references are to the Health and Safety Code.

as the room assignment provision, creates an unconstitutional gender-based classification and conclude Taking Offense's equal protection argument lacks merit.

**FACTS AND PROCEEDINGS**

*Senate Bill No. 219*

Among other provisions, Senate Bill No. 219 added section 1439.51, which provides in relevant part: "(a) Except as provided in subdivision (b), it shall be unlawful for a long-term care facility[2] or facility staff to take any of the following actions wholly or partially on the basis of a person's actual or perceived sexual orientation, gender identity, gender expression, or human immunodeficiency virus (HIV) status: [¶] . . . [¶] (3) Where rooms are assigned by gender, assigning, reassigning, or refusing to assign a room to a transgender resident other than in accordance with the transgender resident's gender identity, unless at the transgender resident's request. [¶] . . . [¶] (5) Willfully and repeatedly fail to use a resident's preferred name or pronouns after being clearly informed of the preferred name or pronouns. [¶] . . . [¶] (b) This section shall not apply

---

[2] "Long-term health care facility" includes facilities listed in Health and Safety Code section 1418 and Welfare and Institutions Code section 9701, subdivision (b). (Health & Saf. Code, § 1439.50, subd. (e).) Health and Safety Code section 1418 defines "long-term health care facility" as any licensed facility to include: skilled nursing facility, intermediate care facility, congregate living health facility, and nursing facility. Welfare and Institutions Code section 9701, subdivision (b) defines "long-term care facility" as "[a]ny nursing or skilled nursing facility, as defined by Section 1250 of the Health and Safety Code," or "[a]ny residential care facility for the elderly as defined in Section 1569.2 of the Health and Safety Code." Finally, Health and Safety Code section 1569.2, subdivision (o)(1) defines " 'Residential care facility for the elderly' " in part as "a housing arrangement chosen voluntarily by persons 60 years of age or over, or their authorized representative, where varying levels and intensities of care and supervision, protective supervision, personal care, or health-related services are provided, based upon their varying needs, as determined in order to be admitted and to remain in the facility."

3

to the extent that it is incompatible with any professionally reasonable clinical judgment."[3]

Senate Bill No. 219 also added sections 1439.52 and 1439.54. Section 1439.52 requires long-term care facilities to employ procedures for keeping records of a resident's gender identity, correct name as indicated by the resident, and the resident's preferred pronoun. Section 1439.54 provides: "A violation of this chapter shall be treated as a violation under Chapter 2 (commencing with Section 1250), Chapter 2.4 (commencing with Section 1417), or Chapter 3.2 (commencing with Section 1569)." Section 1290, in turn, provides that willful and repeated violation of section 1439.51, subdivision (a) is a

---

[3] In addition to subdivisions (a)(3) and (a)(5), which are the subject of this opinion, section 1439.51, subdivision (a) also prohibits facilities and staff from taking the following actions wholly or partially based on a resident's actual or perceived sexual orientation, gender identity, gender expression, or HIV status: "(1) Deny admission to a long-term care facility, transfer or refuse to transfer a resident within a facility or to another facility, or discharge or evict a resident from a facility. [¶] (2) Deny a request by residents to share a room. [¶] . . . [¶] (4) Prohibit a resident from using, or harass a resident who seeks to use or does use, a restroom available to other persons of the same gender identity, regardless of whether the resident is making a gender transition or appears to be gender-nonconforming. Harassment includes, but is not limited to, requiring a resident to show identity documents in order to gain entrance to a restroom available to other persons of the same gender identity. [¶] . . . [¶] (6) Deny a resident the right to wear or be dressed in clothing, accessories, or cosmetics that are permitted for any other resident. [¶] (7) Restrict a resident's right to associate with other residents or with visitors, including the right to consensual sexual relations, unless the restriction is uniformly applied to all residents in a nondiscriminatory manner. This section does not preclude a facility from banning or restricting sexual relations, as long as the ban or restriction is applied uniformly and in a nondiscriminatory manner. [¶] (8) Deny or restrict medical or nonmedical care that is appropriate to a resident's organs and bodily needs, or provide medical or nonmedical care in a manner that, to a similarly situated reasonable person, unduly demeans the resident's dignity or causes avoidable discomfort."

misdemeanor punishable by a fine not to exceed $2,500 or by imprisonment of up to 180 days.[4]

*Procedural History*

Taking Offense filed a petition for writ of mandate asserting facial challenges to section 1439.51, subdivisions (a)(3) and (a)(5). The petition alleged that subdivision (a)(5), the pronoun provision, (1) is unconstitutionally vague and overbroad, in violation of due process of law; (2) violates the equal protection of laws; and (3) violates First Amendment rights of freedom of expression, thought, religion, conscience, and association. The petition also contended subdivision (a)(3), the room assignment provision, violates the First Amendment right to freedom of association as well as equal protection.

Following briefing, the trial court issued a tentative ruling denying the petition in its entirety. No party contested the tentative ruling, which became the court's order. Taking Offense timely filed a notice of appeal.

This case was fully briefed as of August 20, 2020. It was ordered to calendar in March 2021 and argued on May 18, 2021.

**DISCUSSION**

I

*Standard of Review*

"We begin by recognizing the 'strong presumption of the constitutionality of an act of the Legislature.' [Citation.] ' "In considering the constitutionality of a legislative

---

[4] Section 1290 provides a non-exclusive list of factors for the court to consider when determining punishment: "(1) Whether the violation exposed the patient to the risk of death or serious physical harm. [¶] (2) Whether the violation had a direct or immediate relationship to the health, safety, or security of the patient. [¶] (3) Evidence, if any, of willfulness. [¶] (4) The number of repeated violations. [¶] (5) The presence or absence of good faith efforts by the defendant to prevent the violation." (*Id*., subd. (c).)

5

act we presume its validity, resolving all doubts in favor of the Act.  Unless conflict with a provision of the state or federal Constitution is clear and unquestionable, we must uphold the Act." '  [Citation.]  '[M]ere doubt by the judicial branch of the government as to the validity of a statute will not afford a sufficient reason for a judicial declaration of its invalidity, but . . . statutes must be upheld as constitutional unless their invalidity *clearly*, *positively*, *and unmistakably appears*.'  [Citation.]  These principles govern a challenge to the facial validity of a statute.  [Citation.]"  (*City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1503-1504.)

"The constitutionality of a statute is a question of law, which we review de novo. [Citations.]"  (*Vergara v. State of California* (2016) 246 Cal.App.4th 619, 642.)  Taking Offense brings facial challenges to section 1439.51, subdivisions (a)(3) and (a)(5), which has been subject to different standards of review by our Supreme Court.  "Under the strictest test, the statute must be upheld unless the party establishes the statute ' "inevitably pose[s] a present total and fatal conflict with applicable constitutional prohibitions." '  [Citation.]  Under the more lenient standard, a party must establish the statute conflicts with constitutional principles ' "in the generality or great majority of cases." '  [Citation.]  Under either test, the plaintiff has a heavy burden to show the statute is unconstitutional in all or most cases, and ' "cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute." ' "  (*Coffman Specialties, Inc. v. Department of Transportation* (2009) 176 Cal.App.4th 1135, 1145.)

II

*First Amendment Challenge to Section 1439.51, Subdivision (a)(5)*

Taking Offense first challenges the pronoun provision on the basis that it is a content- and viewpoint-based restriction on speech that cannot survive strict scrutiny. Taking Offense raises multiple other contentions, including that the provision is:  (1) a prior restraint on speech; (2) a violation of the freedom of thought, comparing

6

transgender residents of long-term care facilities to "kings and masters over the rest of the people" and employees of long-term care facilities to "their virtual subjects and slaves"; (3) a violation of the freedom of "conscience, religion and belief"; and (4) a violation of the right to free exercise of religion.

As we will explain, we agree that the pronoun provision is a content-based restriction on speech. The law compels long-term care facility staff to alter the message they would prefer to convey, either by hosting a message as required by the resident or by refraining from using pronouns at all. We are required to apply strict scrutiny to the law by the high court's decision in *Reed v. Town of Gilbert* (2015) 576 U.S. 155 at page 163 (*Reed*). As we discuss at greater length *post*, we recognize the State has a compelling interest in eliminating discrimination against residents of long-term care facilities. However, we conclude the pronoun provision is not narrowly tailored to achieve a compelling government objective because it burdens speech more than is required to achieve the State's compelling objective. Accordingly, the provision does not survive strict scrutiny.

A. *First Amendment Principles*

The First Amendment to the United States Constitution states: "Congress shall make no law . . . abridging the freedom of speech . . . ." This fundamental right to free speech applies to the states through the Fourteenth Amendment's due process clause. (*Gitlow v. New York* (1925) 268 U.S. 652, 666.) Similarly, article I, section 2, subdivision (a) of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Article I's free speech clause enjoys existence and force independent of the First Amendment to the federal Constitution. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 489.)

A person's right to speak freely prohibits the government from compelling adoption of a government message and protects the right of citizens to refrain from

speaking.  (See *West Virginia State Board of Education v. Barnette* (1943) 319 U.S. 624, 642 (*Barnette*) [state may not compel students to recite pledge of allegiance and salute the flag]; *Wooley v. Maynard* (1977) 430 U.S. 705, 715 (*Wooley*) [state may not compel motorists to display New Hampshire's state motto of "Live Free or Die" on license plates].)  The government is also limited in its ability to compel a speaker to accommodate another speaker's message.  (See *Miami Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo* (1974) 418 U.S. 241, 258 (*Tornillo*) [government cannot require newspaper to publish political candidate's responses to critiques from the paper]; *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557, 581 [state may not compel private parade organizer to include a group in a parade where the organizer did not want to project the group's message].)

Generally, the free speech clause protects a wide variety of speech a listener may find offensive, including insulting speech based on race, national origin, or religious beliefs.  (See, e.g., *Brandenburg v. Ohio* (1969) 395 U.S. 444, 448-449; *Cantwell v. Connecticut* (1940) 310 U.S. 296, 308; *Saxe v. State College Area Sch. Dist.* (3d Cir. 2001) 240 F.3d 200, 206.)  Our Supreme Court has observed, "[s]urely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us."  (*Cohen v. California* (1971) 403 U.S. 15, 25.)  " '[I]nsults may contain a point of view that the speaker is entitled to express and his audience to hear. "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases." ' [Citations.]"  (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 152 (conc. opn. of Werdeger, J.) (*Aguilar*).)

But despite the broad language of the First Amendment and the free speech clause of the California Constitution, it is a "long established" and "fundamental principle" that "the freedom of speech . . . does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language."  (*Gitlow v. New York*, *supra*, 268

8

U.S. at p. 666 [collecting cases].)  "From 1791 to the present, . . . our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'  [Citation.]"  (*R.A.V. v. City of St. Paul* (1992) 505 U.S. 377, 382-383 (*R.A.V.*) [recognizing historic and traditional categories familiar to the bar, including obscenity, defamation, and "fighting words"].)

Our Supreme Court has similarly recognized that the government is entitled to regulate speech in a variety of contexts.  (See *Aguilar*, *supra*, 21 Cal.4th at p. 134.)  In *Aguilar* the court recognized many crimes (such as soliciting a bribe, perjury, making a terrorist threat) and civil wrongs (including slander and intentional infliction of emotional distress) consist solely of spoken words.  (*Ibid.*)  The court continued, "[a] statute that is otherwise valid, and is not aimed at protected expression, does not conflict with the First Amendment simply because the statute can be violated by the use of spoken words or other expressive activity.  [Citation.]"  (*Ibid.*)

Interpreting the high court's decisions, the *Aguilar* court held civil liability for "harassing speech that is sufficiently severe or pervasive to constitute employment discrimination" under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) does not run afoul of the First Amendment.  (*Aguilar*, *supra*, 21 Cal.4th at p. 137; see also *R.A.V.*, *supra*, 505 U.S. at p. 389; *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 (*Harris*); Fallon, *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark,* 1994 Sup.Ct.Rev. 1, 12.)  However, in the context of hostile work environment claims under Title VII of the Civil Rights Act of 1964,[5] the high court has held that mere utterance of an ethnic or racial epithet

---

[5]  Title VII makes it "an unlawful employment practice for an employer  [¶]  (1)  [t]o discriminate against any individual with respect to his compensation, terms, conditions,

engendering offensive feelings is insufficient to establish a claim.  (*Meritor Savings Bank v. Vinson* (1986) 477 U.S. 57, 67; *Harris*, at p. 21 [conduct not sufficiently severe or pervasive to create objectively hostile work environment is beyond Title VII's purview].)

The pronoun provision at issue here tests the limits of the government's authority to restrict pure speech that, while *potentially* offensive or harassing to the listener, does not *necessarily* create a hostile environment.  As the Third Circuit Court of Appeals has recognized, " '[w]here pure expression is involved,' anti-discrimination law 'steers into the territory of the First Amendment.' " (*Saxe v. State College Area Sch. Dist.*, *supra*, 240 F.3d at p. 206.)

B.  *Content-Based Restrictions On Speech*

The Supreme Court has recognized varying levels of scrutiny to balance individuals' right of free speech against the government's interest in regulating speech. Content-based laws are presumptively unconstitutional and are subject to strict scrutiny. (*Reed*, *supra*, 576 U.S. at p. 163; *Nat'l Inst. of Family & Life Advocates v. Becerra* (2018) __ U.S. __ [138 S.Ct. 2361, 2371] (*Family and Life Advocates*); *R.A.V.*, *supra*, 505 U.S. at p. 382.)  A law is content based if it "targets speech based on its communicative content" and "applies to particular speech because of the topic discussed or the idea or message expressed."  (*Reed*, at p. 163 [the government " 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content' "].) If "a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys," the law is content based.  (*Ibid.*)  Similarly, a law is content based if it "require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation [of the law] has occurred" (*McCullen v.*

---

or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  (42 U.S.C. § 2000e-2, subd. (a)(1).)

*Coakley* (2014) 573 U.S. 464, 479 (*McCullen*)), or if it "suppresses expression out of concern for its likely communicative impact" (*United States v. Eichman* (1990) 496 U.S. 310, 317). To survive strict scrutiny, the law must be narrowly tailored to serve compelling state interests. (*Family and Life Advocates*, *supra*, __ U.S. at p. __ [138 S.Ct. at p. 2371].)

The Attorney General argues the pronoun provision is content neutral (as opposed to content based). Content-neutral laws are subject to intermediate scrutiny, which requires that the law is narrowly tailored to serve a significant governmental interest and leaves open ample alternative avenues for communication. (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 791; *Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 364.) The Attorney General presents several arguments in support of this assertion, none of which persuade.

First, the Attorney General contends the Legislature had a benign motive in enacting the provision, and the law applies equally to all long-term care facility residents of any sexual orientation, gender identity, gender expression, or HIV status. He quotes the high court's opinion in *Ward v. Rock Against Racism*, *supra*, 491 U.S. at page 791, which stated the " 'principal inquiry' in assessing whether a restriction is content-based 'is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.' " But the high court clarified *Ward* in *Reed*, concluding that our initial inquiry is properly whether the law is facially content based, rather than whether the government had a benign motive or whether the law applies equally to all residents. (See *Reed*, *supra*, 576 U.S. at pp. 165-166.) Indeed, the *Reed* court referred to the determination of whether the law is content neutral on its face as the "crucial first step" in the content-neutrality analysis. (*Id*. at p. 165.) The court recognized: "A law that is content-based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech. [Citation.]" (*Ibid*.) The court

continued:  "In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral."  (*Id.* at p. 166.)  Accordingly, only when the law is facially content neutral may we look to governmental motive, "including whether the government had regulated speech 'because of disagreement' with its message, and whether the regulation was ' "justified without reference to the content of the speech." ' [Citation.]"  (*Id.* at p. 167.)

Applying *Reed*, the pronoun provision is content based on its face because it draws a distinction between what is and what is not permissible based on the content of what is said.  (See *Reed*, *supra*, 576 U.S. at p. 164.)  If an employee's speech repeatedly and willfully misgenders[6] a long-term care facility resident, the speech is criminalized.  If an employee's speech does not misgender a resident, or if the employee misgenders the resident only once or unintentionally, the speech is not criminalized.  To determine whether an employee has violated the pronoun provision, an enforcement authority must analyze the content of the speech (*McCullen*, *supra*, 573 U.S. at p. 479 [law is content based where it requires enforcing authority to analyze the content of the speech]) and determine whether the content of the speech runs afoul of the law.  Moreover, the Legislature's purpose in enacting the law was to prohibit staff from willfully and repeatedly misgendering a resident due to the harassing, discriminatory, or insulting nature of that speech; in other words, its communicative effect.  (See, e.g., *Family and Life Advocates*, *supra*, __ U.S. at p. __ [138 S.Ct. at p. 2371] [requiring health care providers to inform women how to obtain state-subsidized abortions plainly alters the content of their speech].)

_____

[6]  "Misgender" refers to the systematic misuse of one's preferred pronouns by another.  (Clawson, *I Now Pronoun-ce You:  A Proposal For Pronoun Protections for Transgender People* (2019) 124 Penn. St. L.Rev. 247, 255.)

Second, the Attorney General argues the law is content neutral because it does not dictate speech; employees remain free to avoid using the pronouns at issue entirely. We agree the pronoun provision does not compel speech in the same way that the government compelled students to recite the pledge of allegiance and salute the American flag in *Barnette*, *supra*, 319 U.S. at page 642. There, the court concluded that "the compulsory flag salute and pledge requires affirmation of a belief and an attitude of mind" and would authorize public authorities to compel an individual to "utter what is not in his mind." (*Id.* at pp. 633, 634.) The facts here are also distinct from those in *Wooley*, *supra*, 430 U.S. at page 707, in which the high court concluded the State of New Hampshire could not require citizens to display the state motto on their vehicles' license plates. The court recognized the license plate requirement " 'invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.' " (*Id.* at p. 715, quoting *Barnette*, *supra*, 319 U.S. at p. 642.) The court held the government's interest in identifying vehicles could be accomplished by less drastic means, and "where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." (*Wooley,* at p. 717.) Here, in clear contrast to *Barnette* and *Wooley*, staff of long-term care facilities remain free to not use pronouns at all, and are not compelled to voice support for a government message.

However, "the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." (*Wooley*, *supra*, 430 U.S. at p. 714.) For purposes of the First Amendment, there is no difference between a law compelling an employee to utter a resident's preferred pronoun and prohibiting an employee from uttering a pronoun the resident does not prefer. (See *Gerawan Farming, Inc. v. Lyons*, *supra*, 24 Cal.4th at pp. 487-488 [right to free speech put at risk by prohibiting a speaker from saying what he would otherwise say]; *Riley v. National Federation of Blind, Inc.* (1988) 487 U.S. 781, 796-797 [no difference of constitutional

13

significance between compelled speech and compelled silence]; *Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 641.) Accordingly, we disagree with the Attorney General that the restriction on speech here is content neutral simply because employees may refrain from using pronouns altogether to avoid misgendering.

Third, the Attorney General argues the restriction on speech is derived from the individual resident, not the state, and therefore the statute does not reflect a state preference regarding what language is used. This line of reasoning was rejected in *Tornillo*, *supra*, 418 U.S. at page 258, in which the high court recognized that compelling a newspaper to print the message of a political candidate who had been criticized by the newspaper infringed on the newspaper editors' right to express their preferred message. Similarly, here, the issue is not whether the government is expressly telling employees what they must say, but rather that the government is compelling employees to give voice to the resident's preferred pronoun where that pronoun expressly contradicts the message the employee would prefer to voice.

Fourth and finally, the Attorney General contends the restriction on speech is content neutral because pronouns are merely stand-ins for nouns and are not ideological messages. But the Legislature understood the importance of pronouns' content and, thereby, their *meaning*, in this context, to the point that it passed a law criminalizing misgendering transgender residents of long-term care facilities. We recognize that misgendering may be disrespectful, discourteous, and insulting, and used as an inartful way to express an ideological disagreement with another person's expressed gender identity. But the First Amendment does not protect only speech that inoffensively and artfully articulates a person's point of view. At the very least, willful refusal to refer to transgender persons by their preferred pronouns conveys general disagreement with the concept that a person's gender identity may be different from the sex the person was assigned at birth. Consistent with the Legislature's findings in enacting section 1439.51, we conclude misgendering does indeed convey an ideological message.

14

Because the pronoun provision is a content-based restriction of speech, we disagree with both the trial court and the Attorney General, who argues the provision is merely a time, place, or manner restriction. (See *Reno v. ACLU* (1997) 521 U.S. 844, 879 [" 'time, place and manner' " analysis not applicable when statute "regulates speech on the basis of its content"].)

E. *Determining The Appropriate Level Of Scrutiny*

We directed the parties to supplementally brief the issue of whether the Supreme Court's decision in *Reed*, *supra*, 576 U.S. 155 requires us to apply strict scrutiny to the pronoun provision. In *Reed*, the regulation at issue identified various categories of signs based on the type of information conveyed and subjected each category to different restrictions. The regulation subjected temporary signs directing the public to a meeting to more stringent restrictions than other messages. A religious group without a permanent location challenged the regulation as content based, and the court held the regulation was a content-based restriction on speech. (*Id.* at p. 171.) As we have discussed, *Reed* concluded content-based restrictions on speech are subject to strict scrutiny. (*Ibid.*)

*Reed*'s broad conclusion that content-based laws are subject to strict scrutiny appears to apply here. But the Attorney General observes courts have been hesitant to apply *Reed*'s holding to areas of law where alternative tests and different levels of scrutiny had been applied before *Reed* was decided. (See, e.g., *United States v. Swisher* (9th Cir. 2016) 811 F.3d 299, 313 [*Reed* does not affect historic and traditional categories of content-based restrictions that are not subject to strict scrutiny under the First Amendment, such as incitement, obscenity, defamation, speech integral to criminal conduct, "so-called 'fighting words,' " child pornography, fraud, true threat, " 'speech presenting some grave and imminent threat the government has the power to prevent,' " and torts involving intentional infliction of emotional distress, lying to a government official, false claims of terrorist attacks or other lies about the commission of crimes or catastrophes, impersonation of an officer, and trademark infringement, among others];

15

*Mass. Ass'n of Private Career Sch. v. Healey* (D. Mass. 2016) 159 F.Supp.3d 173, 192-193 [*Reed* does not disturb longstanding framework regarding commercial speech]; *Lone Star Security & Video, Inc. v. City of Los Angeles* (9th Cir. 2016) 827 F.3d 1192, 1198, fn. 3 [commercial speech subject to intermediate scrutiny]; *Flanigan's Enterprises, Inc. of Ga. v. City of Sandy Springs, Ga.* (11th Cir. 2017) 703 Fed.Appx. 929, 935 [observing *Reed* did not address the secondary effects doctrine]; *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, and Reinforcing Iron Workers, Local 229, AFL-CIO* (9th Cir. 2019) 941 F.3d 902, 906 [*Reed* does not apply to unlawful conduct--secondary boycotts-- where it did not expressly overrule earlier Supreme Court precedent].)

The Attorney General does not contend any of the categories in the cases cited above applies here, but he contends the captive audience doctrine should be considered among the categories of speech subject to a standard requiring less than strict scrutiny. To address that issue, we briefly describe the captive audience doctrine.

Generally, listeners exposed to offensive speech are expected to avoid the speech if they are not receptive thereto. (See *Erznozik v. City of Jacksonville* (1975) 422 U.S. 205, 210-211 [government may not censor nudity not amounting to obscenity where images visible from the highway]; *Cohen v. California, supra,* 403 U.S. at pp. 21-22 [government may not censor potentially offensive message on the back of a jacket worn in public corridors of courthouse, although passerby would be exposed to the message]; *United States v. Playboy Entertainment Group, Inc.* (2000) 529 U.S. 803, 813-814, 827 [rejecting restrictions on "scrambling" of sexually explicit programming on cable because adults may inadvertently observe fleeting "unscrambled" images].) But in limited circumstances, "when an audience has no reasonable way to escape hearing an unwelcome message, greater restrictions on a speaker's freedom of expression may be tolerated." (*Aguilar, supra*, 21 Cal.4th at p. 159 (conc. opn. of Werdegar, J.); see *Rowan v. U.S. Post Office Dept.* (1970) 397 U.S. 728, 738 [rejecting challenge to statute permitting residents to opt out of receipt of sexually themed mailings under the captive

16

audience doctrine]; *FCC v. Pacifica Foundation* (1978) 438 U.S. 726, 748-749 [upholding sanctions against radio station for broadcasting an "indecent" monologue during hours young children may be listening]; *Hill v. Colorado* (2000) 530 U.S. 703, 716-717).) "The right to free speech, of course, includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience. But the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it." (*Hill*, at p. 716.)

In *Frisby v. Schultz* (1988) 487 U.S. 474 at page 484, the high court recognized that the home is uniquely deserving of protections: " 'The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.' [Citation.] Our prior decisions have often remarked on the unique nature of the home, 'the last citadel of the tired, the weary, and the sick,' [citation] and have recognized that '[p]reserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value.' "

In *Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753 at page 768, the court recognized the state's strong interest in residential privacy applied by analogy to medical privacy, recognizing the substantial privacy interest in "not only the psychological, but also the physical, well-being of the [hospital] patient held 'captive' by medical circumstance." (See also *Hill v. Colorado*, *supra*, 530 U.S. at pp. 728-730 [upholding a buffer zone around clinic entrances due to the "unique concerns that surround health care facilities," where those using the facilities "are often in particularly vulnerable physical and emotional conditions"].) The high court has observed: " 'Hospitals, after all, are not factories or mines or assembly plants. They are hospitals, where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets

17

of the day's activity, and where the patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere.' " (*NLRB v. Baptist Hospital, Inc.* (1979) 442 U.S. 773, 783, fn. 12, 784.)

Long-term care facility residents are analogous to citizens in their homes. There is little doubt that many--if not all--residents who have expressed a pronoun preference are an unwilling audience for repeated and willful misgendering, if it should occur, and they have little, if any, ability to simply avoid harassing or discriminatory speech.

However, while long-term care facility residents are similar to other captive audience *listeners*, the speakers in this case are distinguishable from *speakers* in other instances where the captive audience doctrine has been applied. Taking Offense asserts that both residents *and* employees of long-term care facilities are "captive audiences," and therefore the doctrine should not be applied to lessen the scrutiny given to laws that restrict the content of employees' speech and to compel them to host a message with which they may not agree. While we disagree with the characterization of *employees* as "captive audiences" and see no support for that characterization in the relevant jurisprudence, we recognize we must consider the legitimate speech interests of employees, who, like residents, are not readily able or expected to go elsewhere to express their views.[7] (See *Aguilar*, *supra*, 21 Cal.4th at p. 185 (dis. opn. of Kennard, J.).) While the residents are in what amounts to their own home, the employees are in their own workplace. Given the First Amendment rights of employees in their workplace, we decline to rely on the captive audience doctrine here to apply less than strict scrutiny.

---

[7] Taking Offense points to Justice Werdegar's concurring opinion in *Aguilar*, *supra*, 21 Cal.4th at page 159, which included a header: "Employees Are a Captive Audience." But in that case, employees were on the *receiving* end of the *defendant's* offensive speech. (*Id.* at p. 160 (conc. opn. of Werdegar, J.).) Justice Werdegar's concurring opinion did not remotely suggest that employees who utter offensive comments could themselves be classified as a captive audience.

Nor do cases decided subsequent to *Reed* convince us we should apply anything less than strict scrutiny to the pronoun provision.  Recently in a case more closely related to the facts here, the highest court considered a California law that required, *inter alia*, licensed healthcare clinics to "notify women that California provides free or low-cost services, including abortions, and give them a phone number to call." (*Family and Life Advocates*, *supra*, __ U.S. at p. __ [138 S.Ct. at p. 2368].)  The court observed such a notice requirement is a content-based restriction of speech and rejected the Ninth Circuit's conclusion that the law was subject to less than strict scrutiny as "professional speech." (*Id.* at pp. ___[138 S.Ct. at pp. 2371-2372].)  The court recognized that professional speech has been afforded less protection where the speech at issue is "factual, noncontroversial information in their 'commercial speech,' " and where the regulation involves professional conduct that only incidentally involves speech.  (*Id.* at p. 2372.)  The court concluded neither line of precedent was implicated in that case.  (*Ibid.*)

The court recognized neither California nor the Ninth Circuit identified a persuasive reason why professional speech is a unique category exempt from ordinary First Amendment principles, but it did not "foreclose the possibility that some such reason exists." (*Family and Life Advocates*, *supra*, __ U.S. at p. __ [138 S.Ct. at p. 2375].)  It concluded it need not decide whether professional speech is exempt from those principles, because the regulation could not survive even intermediate scrutiny because it was not sufficiently drawn to achieve a substantial state interest.  (*Ibid.*)

While *Family and Life Advocates* did not expressly state that the content-based law at issue there was subject to strict scrutiny, it provided that "professional speech" was not an acceptable basis in that case on which to apply anything less than strict scrutiny and thereby implied that strict scrutiny was the appropriate standard of review in that case.  We apply strict scrutiny to the pronoun provision.  (§ 1439.51, subd. (a)(5).)

F.  *Applying Strict Scrutiny*

1.  *Government Interest*

We analyze whether the government has shown it has a compelling interest in preventing misgendering of LGBT residents of long-term care facilities.  (*Family and Life Advocates*, *supra*, __ U.S. at p. __ [138 S.Ct. at p. 2371].)  In enacting Senate Bill No. 219, the Legislature made several specific findings:

"(a) In 2006, the California Legislature found that 'lifelong experiences of marginalization place [LGBT] seniors at high risk for isolation, poverty, homelessness, and premature institutionalization.  Moreover, many LGBT seniors are members of multiple underrepresented groups, and as a result, are doubly marginalized.  Due to these factors, many LGBT seniors avoid accessing elder programs and services, even when their health, safety, and security depend on it.'

"(b) Recent studies confirm the state's findings and provide evidence that LGBT seniors experience discrimination, including in long-term care facilities where residents are particularly vulnerable because they must rely on others for necessary care and services, and may no longer enjoy the privacy of having their own home or even their own room.

"(c) According to 'Stories from the Field:  LGBT Older Adults in Long-Term Care Facilities,' a 2011 study published by the National Senior Citizens Law Center, these issues have gone unaddressed.  In that study, 43 percent of respondents reported personally witnessing or experiencing instances of mistreatment of LGBT seniors in a long-term care facility, including all of the following:  being refused admission or readmission, being abruptly discharged, verbal or physical harassment from staff, staff refusal to accept medical power of attorney from the resident's spouse or partner, discriminatory restrictions on visitation, and staff refusal to refer to a transgender resident by his or her preferred name or pronoun.  Eighty-one percent of respondents believed that other residents would discriminate against an LGBT elder in a long-term care facility, 89

20

percent of respondents believed that staff would discriminate against an LGBT elder in a long-term care facility, and 53 percent believed that staff discrimination would rise to the level of abuse or neglect. Though this was a national report, it included instances of severe discrimination within California.

"(d) Even more recently, in 2013, the San Francisco LGBT Aging Policy Task Force commissioned a report by Professor Karen Fredriksen-Goldsen of the University of Washington, 'Addressing the Needs of LGBT Older Adults in San Francisco: Recommendations for the Future,' based on information collected from over 600 LGBT seniors residing in San Francisco, including nearly 140 LGBT seniors of color. This report found that nearly 60 percent of the study participants lived alone, and of the 15 percent of the study participants who had children, 60 percent reported that these children would not be available to assist them. Many reported poor physical and mental health with nearly one-third of all respondents reported poor general health, close to one-half reported having one or more disabilities, and one-third of male participants reported that they were living with [HIV] or acquired immune deficiency syndrome (AIDS). These results indicate that, as compared to seniors in San Francisco generally, LGBT seniors have a heightened need for care, but often lack family support networks available to non-LGBT seniors. Further, LGBT seniors' fear of accessing services is justified. Nearly one-half of the participants in the San Francisco study reported experiencing discrimination in the prior 12 months because of their sexual orientation or gender identity." (Stats. 2017, ch. 483, § 1.)

We agree with the Attorney General that the state has a compelling interest in eliminating discrimination on the basis of sex. (See, e.g. *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte* (1987) 481 U.S. 537, 549 [eliminating discrimination against women is a compelling government interest]; *Roberts v. United States Jaycees* (1984) 468 U.S. 609, 626 [state had a compelling interest "of the highest order" in eradicating sex discrimination]; *EEOC v. Pacific Press Publishing Ass'n* (9th Cir. 1982) 676 F.2d

21

1272, 1280 [compelling state interest in ending discrimination], abrogation on other grounds recognized by *Am. Friends Service Committee Corp. v. Thornburgh* (9th Cir. 1991) 951 F.2d 957, 960; *EEOC v. Mississippi College* (5th Cir. 1980) 626 F.2d 477, 488 ["the government has a compelling interest in eradicating discrimination in all forms"]; *Gay Rights Coalition of Georgetown University Law Center v. Georgetown University* (D.C. Ct.App. 1987) 536 A.2d 1, 38 ["eradication of sexual orientation discrimination is a compelling governmental interest"].) The high court has recognized that discrimination on the basis of "sex" includes discrimination on the basis of sexual orientation or transgender status. (*Bostock v. Clayton County* (2020) __ U.S. __ [140 S.Ct. 1731, 1741] (*Bostock*).) Our Supreme Court has also recognized that the state has a compelling interest "in ensuring full and equal access to medical treatment irrespective of sexual orientation." (*North Coast Women's Care Medical Group, Inc. v. Superior Court* (2008) 44 Cal.4th 1145, 1158.)

### 2. *Narrowly Tailored*

As we have discussed, it is not enough for the government to identify a compelling interest. The government must also show the statute furthers the compelling interest and is "narrowly tailored to that end." (*Reed*, *supra*, 576 U.S. at p. 171.) To satisfy the narrow tailoring requirement in the case of a content-based speech restriction, the government must show the law is the least restrictive alternative of achieving the government interest. (*Ashcroft v. ACLU* (2004) 542 U.S. 656, 666 [government need not show it has exhausted every enforcement strategy and demonstrated failure, it must only show it adopted the least restrictive means available to achieve government interest] (*Ashcroft*).) Included within the "least restrictive alternative" inquiry are the related components that the law must advance the government interest (e.g. *Meyer v. Grant* (1988) 486 U.S. 414, 426; *FEC v. Massachusetts Citizens for Life, Inc.* (1986) 479 U.S. 238, 262), must not be overinclusive, meaning the law may not restrict speech that does not implicate the government interest (*McCullen*, *supra*, 573 U.S. at p. 495), and may not

22

be underinclusive, meaning it fails to restrict a significant amount of speech harming the government interest to the same degree as the restrictive speech (e.g. *Florida Star v. B.J.F.* (1989) 491 U.S. 524, 540).

The burden is on the government to prove proposed alternatives will not be as effective as the challenged statute. (*Ashcroft, supra,* 542 U.S. at p. 665.) "In considering this question, a court assumes that certain protected speech may be regulated, and then asks what is the least restrictive alternative that can be used to achieve that goal. The purpose of the test is not to consider whether the challenged restriction has some effect in achieving [the Legislature's] goal, regardless of the restriction it imposes. The purpose of the test is to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to ensure that legitimate speech is not chilled or punished. For that reason, the test does not begin with the status quo of existing regulations, then ask whether the challenged restriction has some additional ability to achieve [the Legislature's ] legitimate interest. Any restriction on speech could be justified under that analysis. Instead, the court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives." (*Id.* at p. 666.)

Taking Offense asserts criminalizing speech is not the least restrictive means for constraining it. It proposes adopting an administrative employment law enforced by the Fair Employment and Housing Agency, with its attendant due process rules and regulations, requiring staff to refer to residents by their preferred names and pronouns to prevent "hostile environment" civil rights objections similar to the workplace harassment claims at issue in *Aguilar*, *supra*, 21 Cal.4th 121.

The Attorney General responds Taking Offense's proposed less restrictive means would not be as effective as those currently contained in the pronoun provision. He argues the employment laws described by Taking Offense do not offer protections to residents of long-term care facilities as non-employees, do not provide residents with a private right of action, and would create an excessively high burden by requiring elderly

residents to file administrative claims or possibly civil lawsuits. He contends that the law is no broader than necessary to serve the government interest: it only applies to employees in the workplace where the resident's clearly expressed pronoun preference is willfully and repeatedly disregarded by staff, and it does not apply to the extent it is incompatible with any professionally reasonable clinical judgment. (§ 1439.51, subds. (a)(5), (b).)

In enacting section 1439.51, the Legislature recognized that "state and local laws already prohibit discrimination in public accommodations on the basis of actual or perceived sexual orientation, gender identity, gender expression, and HIV status." (Stats. 2017, ch. 483, § 1, subd. (e).) The Legislature justified the apparent duplicative nature of section 1439.51, subdivision (a)(5) by asserting: "the promise of these laws has not yet been fully actualized in long-term care facilities. The purpose of this act is to accelerate the process of freeing LGBT residents and patients from discrimination, both by specifying prohibited discriminatory acts in the long-term care setting and by providing additional information and remedies to ensure that LGBT residents know their rights and have the means to vindicate them." (Stats. 2017, ch. 483, § 1, subd. (e).)

Taking Offense argues that imposing civil, rather than criminal, liability through an administrative employment law scheme is *necessarily* a less restrictive means of achieving the government interest. We acknowledge Taking Offense's concern that the imposition of criminal penalties and the associated stigma can have a chilling effect on speech. (See *Ashcroft, supra,* 542 U.S. at p. 660 ["Content-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people"]; *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 244 ["a law imposing criminal penalties on protected speech is a stark example of speech suppression" such that "even minor punishments can chill protected speech"].)

Although we recognize Taking Offense's concerns, the high court has also recognized that criminal penalties are not always more severe than civil penalties, and

24

civil actions often offer fewer procedural safeguards than their criminal counterparts. (*New York Times v. Sullivan* (1964) 376 U.S. 254, 277.)  In *New York Times,* the court explained, "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel.  The fear of [civil] damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute."  (*Ibid.,* fn. omitted.)  Absent some showing that the civil penalties imposed in Taking Offense's proposed scheme--presuming residents had a right of action in such a scheme--would be less serious than the penalties imposed for violating section 1439.51, we are unable to say civil penalties as described by Taking Offense are a less restrictive means of achieving the government interest than the challenged statute.

However, we conclude the pronoun provision--whether enforced through criminal or civil penalties--is overinclusive in that it restricts more speech than is necessary to achieve the government's compelling interest in eliminating discrimination, including harassment, on the basis of sex.  Rather than prohibiting conduct and speech amounting to actionable harassment or discrimination as those terms are legally defined, the law criminalizes even occasional, isolated, off-hand instances of willful misgendering-- provided there has been at least one prior instance--without requiring that such occasional instances of misgendering amount to harassing or discriminatory conduct.  Using the workplace context as an analogy, the statute prohibits the kind of isolated remarks not sufficiently severe or pervasive to create an objectively hostile work environment. (*Meritor Savings Bank v. Vinson*, *supra*, 477 U.S. at p. 67; *Harris, supra*, 510 U.S. at p. 21.)  There is no requirement in the statute that the misgendering at issue here negatively affect any resident's access to care or course of treatment.  Indeed, there is no requirement that the resident even be *aware* of the misgendering.

We recognize the Legislature's legitimate and laudable goal of rooting out discrimination against LGBT residents of long-term care facilities.  (See *Roberts v. United States Jaycees*, *supra*, 468 U.S. at p. 624 [state had a compelling interest "of the

25

highest order" in eradicating sex discrimination]; *Bostock, supra,* __ U.S. __ [140 S.Ct. at p. 1741] [discrimination on the basis of "sex" includes discrimination on the basis of transgender status].)  As the Legislature recognized, many LGBT seniors are members of multiple underrepresented groups, making them "doubly marginalized," causing them to avoid accessing necessary care and services.  (Stats. 2017, ch. 483, § 1, subd. (a).)  When those seniors do attempt to access care, they are often subject to mistreatment and discrimination by the very staff designated to care for them.  (*Id.*, subd. (b)-(d).)  As evidenced by the Legislature's findings, discrimination and mistreatment against LGBT seniors continues to have a pernicious effect on the ability and willingness of those individuals to obtain long-term care.

But the Attorney General has not shown that criminalizing occasional, off-hand, or isolated instances of misgendering, that need not occur in the resident's presence and need not have a harassing or discriminatory effect on the resident's treatment or access to care, is necessary to advance that goal.

Taking Offense raises multiple other arguments.  First, it asserts the pronoun provision violates employees' freedom of thought, conscience, and belief.  These arguments are subsumed by our discussion on the First Amendment (e.g. *Wooley, supra,* 430 U.S. at p. 714 [freedom of thought is protected by First Amendment's right to speak freely and refrain from speaking at all]), and therefore we do not address them separately. Second, Taking Offense asserts that the provision constitutes a prior restraint on speech. We disagree.  "The term prior restraint is used 'to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.' " (*Alexander v. United States* (1993) 509 U.S. 544, 550.) Threat of criminal sanctions imposed following speech is not sufficient to constitute a prior restraint.  (See *CBS Inc. v. Davis* (1994) 510 U.S. 1315, at p. 1317 [" 'If it can be said that a threat of criminal or civil sanctions after publication "chills" speech, prior restraint "freezes" it at least for the time' "].)  Here there is no such judicial order or

26

licensing or permitting scheme for seeking approval of speech before it occurs. The provision subjects employees willfully and repeatedly misgendering a resident to criminal penalties *after* they speak, but it does not silence employees *before* they speak. Third, Taking Offense contends the provision is a viewpoint-based restriction of speech, and is unconstitutionally vague and overbroad. Because we conclude the law does not survive strict scrutiny as a content-based restriction, we need not reach those issues.

### III

### *Equal Protection Challenge to Section 1439.51, Subdivision (a)(3)*

Section 1439.51, subdivision (a)(3), the room assignment provision, requires that when room assignments in a long-term care facility are made pursuant to a gender-based assignment system, it shall be unlawful for the facility or facility staff to "assign[ ], reassign[ ], or refus[e] to assign a room to a transgender resident other than in accordance with the transgender resident's gender identity, unless at the transgender resident's request."

Taking Offense contends the room assignment provision violates the equal protection clause of the Fourteenth Amendment of the United States Constitution,[8] article I, section 7 of the California Constitution, and the Unruh Civil Rights Act. It makes two implicit assumptions about the room assignment provision: (1) the provision requires a facility to accommodate a transgender resident's request to be assigned to a room other

---

[8] Taking Offense asserts that "gender," "gender identity," and "gender expression" are not protected designations under the equal protection clause of the Fourteenth Amendment of the federal Constitution. It acknowledges, however, that when "gender" is used objectively as referring to "sex" rather than "gender identity" or "gender expression," gender is a suspect classification invoking heightened scrutiny under the federal Constitution. After briefing concluded, the United States Supreme Court concluded a law proscribing discrimination on the basis of sex proscribes discrimination on the basis of sexual orientation or transgender status. (*Bostock*, *supra*, __ U.S. __ [140 S.Ct. 1731].) Accordingly, a law drawing a distinction based on transgender status is subject to heightened scrutiny under federal law.

27

than in accordance with the resident's gender identity; and (2) a resident's request to be assigned a room other than in accordance with the resident's gender identity is equivalent to dictating the gender or gender identity of the resident's roommate. Based on those assumptions, Taking Offense asserts the provision grants transgender residents "special rights" to choose whether to be assigned a roommate according to the transgender person's gender identity or the person's assigned sex at birth, while failing to recognize the same right of non-transgender residents. We disagree.

A. *Equal Protection Under The Federal And California Constitutions*

The United States and California Constitutions prohibit denial of equal protection of the laws. (U.S. Const., 14th Amend.; Cal Const., art. 1, § 7, subd. (a).) The equal protection clause requires the state to treat all persons similarly situated alike or, conversely, to avoid all classifications that are "arbitrary or irrational" and those that reflect " 'a bare . . . desire to harm a politically unpopular group.' " (*City of Cleburne v. Cleburne Living Ctr., Inc.* (1985) 473 U.S. 432, 447.) The state constitutional guarantee is independent of the federal guarantee, but, except in cases of gender, the state and federal guarantees are applied identically. (*Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 31-32 (*Connerly*).) A decision based on a determination that the equal protection guaranteed by the state constitution has been violated will stand on the state ground alone. (*Molar v. Gates* (1979) 98 Cal.App.3d 1, 12 (*Molar*).)

Under federal law, the high court has prescribed different levels of scrutiny depending on whether the law "targets a suspect class." (*Romer v. Evans* (1996) 517 U.S. 620, 631.) "At a minimum, a statutory classification must be rationally related to a legitimate government purpose. [Citations.] Classifications based on race or national origin [citation], and classifications affecting fundamental rights [citation] are given the most exacting scrutiny. Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy. [Citations.]" (*Clark v. Jeter*

28

(1988) 486 U.S. 456, 461; *Connerly*, *supra*, 92 Cal.App.4th at pp. 31-32, citing *United States v. Virginia* (1996) 518 U.S. 515, 532.) The high court has held sex-based discrimination includes discrimination based on transgender status. (*Bostock*, *supra*, __ U.S. __ [140 S.Ct. at p. 1743].) To withstand intermediate scrutiny, the State must show the statutory classification serves important governmental objectives, and the discriminatory means employed are substantially related to the achievement of those objectives. (*Virginia*, at p. 533.)

Under California law, a classification based on gender is considered "suspect" for purposes of equal protection analysis. (*Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 17-20; *Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 564 ["We long ago concluded that discrimination based on gender violates the equal protection clause of the California Constitution (art. I, § 7, subd. (a)) and triggers the highest level of scrutiny."]; *In re Marriage Cases* (2008) 43 Cal.4th 757, 843-844.)[9] Distinctions involving "suspect classifications" requires strict scrutiny, under which "the state must show both that it has a *compelling interest* which justifies the classification and that the classification is *necessary* to further that compelling interest." (*Molar*, *supra*, 98 Cal.App.3d at p. 13; see also *Connerly*, *supra*, 92 Cal.App.4th at p. 33 [suspect classifications subject to strict scrutiny because they are so "pernicious and are so rarely relevant to a legitimate governmental purpose"].) "[C]lassification itself does not of itself deprive a group of equal protection. [Citation.] However, the classification must be based upon some difference between the classes which is pertinent to the purpose for

---

[9] The Attorney General contends classifications based on gender are subject to an intermediate level of review, citing *In re Smith* (2008) 42 Cal.4th 1251, 1263. However, *In re Smith* stated that "[c]lassifications based on gender are subject to an intermediate level of review" under the United States Constitution. (*Ibid.*) The Attorney General cites no authority standing for the proposition that gender-based classifications are subject to intermediate scrutiny rather than strict scrutiny under the California Constitution.

which the legislation is designed. [Citations.]" (*Vincent v. State of California* (1971) 22 Cal.App.3d 566, 572.)

We apply equal protection principles equally regardless of the gender being discriminated against. (*Mississippi University for Women v. Hogan* (1982) 458 U.S. 718, 723; *Connerly*, *supra*, 92 Cal.App.4th at p. 40.)

B. *The "Similarly Situated" Requirement*

"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530.) We do not inquire "whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) "The similarly situated prerequisite applies when the classification is by gender. [Citations.]" (*Woods v. Horton* (2008) 167 Cal.App.4th 658, 671.)

"The use of the term 'similarly situated' in this context refers only to the fact that ' "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." . . .' [Citation.] There is always some difference between the two groups which a law treats in an unequal manner since an equal protection claim necessarily asserts that the law in some way distinguishes between the two groups. Thus, an equal protection claim cannot be resolved by simply observing that the members of group A have distinguishing characteristic X while the members of group B lack this characteristic. The 'similarly situated' prerequisite simply means that an equal protection claim cannot succeed, and does not require further analysis, unless there is some showing that the two groups are sufficiently similar with respect to the purpose of the law in question that some level of scrutiny is required in order to determine whether the distinction is justified." (*People v. Nguyen* (1997) 54 Cal.App.4th 705, 714.)

Taking Offense contends all sexes and genders are similarly situated for equal protection purposes because they are all protected by the same legal classification, "sex," under federal and state law. That characterization is too broad; the Supreme Court and California courts have upheld statutes where a classification based on gender "is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." (*Michael M. v. Superior Court of Sonoma County* (1981) 450 U.S. 464, 469 (plur. opn.) [upholding law imposing criminal penalties on males for engaging in sexual intercourse with females under the age of 18 to whom they are not married, but not similarly punishing females]; *Tuan Anh Nguyen v. INS* (2001) 533 U.S. 53, 73 [upholding a federal law imposing different requirements for citizenship of a child born to one citizen parent and one noncitizen parent, depending upon which parent is the citizen]; *Amy G. v. M.W.* (2006) 142 Cal.App.4th 1, 17, superseded in part by statute as noted in *In re M.C.* (2011) 195 Cal.App.4th 197, 222-223, fn. 13 [biological father's wife not deemed presumed mother because biological mother sought parental relationship]; *In re Shereece B.* (1991) 231 Cal.App.3d 613, 623 [men and women not similarly situated as to birth process].) Therefore, we do not adopt Taking Offense's broad assertion that all sexes and genders are always similarly situated for equal protection purposes.

The Attorney General contends transgender and non-transgender residents are not similarly situated because transgender residents are more likely to be assigned a room inconsistent with their gender identity than are non-transgender residents. We have previously rejected a similar argument made in the context of gender-based classifications in funding for domestic violence programs, recognizing: "this analysis improperly views equal protection rights as group rights, rather than individual rights, and permits discrimination simply because fewer men than women are affected." (*Woods v. Horton, supra,* 167 Cal.App.4th at p. 671.) The question before us is not whether transgender residents of long-term care facilities are historically more likely to experience discrimination. Rather, the question is whether transgender and non-

31

transgender residents are sufficiently similar for purposes of application of the room assignment provision such that the classification is subject to scrutiny.

We recognize that transgender residents possess a characteristic that non-transgender residents do not, namely, a biological sex at birth that differs from their expressed gender identity. Nevertheless, we conclude transgender residents of long-term care facilities are similarly situated to non-transgender residents for purposes of the room assignment provision. Within the context of the statute, both transgender and non-transgender residents of long-term care facilities are subject to a facility's gender-based rooming assignment system, and the law creates a classification based on whether a resident is transgender.

Because we conclude transgender residents and non-transgender residents of long-term care facilities are similarly situated for purposes of an equal protection analysis, we analyze whether the classification established by this provision unconstitutionally favors transgender residents.

C. *Analysis*

Before we apply strict scrutiny (*Molar*, *supra*, 98 Cal.App.3d at p. 12; *Connerly*, *supra*, 92 Cal.App.4th at p. 33), we must first determine the nature of the gender-based classification, and whether that classification favors transgender residents at all. To reiterate, the room assignment provision states: "[I]t shall be unlawful for a long-term care facility or facility staff to take any of the following actions wholly or partially on the basis of a person's actual or perceived sexual orientation, gender identity, gender expression, or human immunodeficiency virus (HIV) status: [¶] . . . [¶] (3) Where rooms are assigned by gender, assigning, reassigning, or refusing to assign a room to a transgender resident other than in accordance with the transgender resident's gender identity, unless at the transgender resident's request." (§ 1439.51, subd. (a)(3).)

This provision creates a general rule and an exception to the rule. The general rule makes it unlawful for a long-term care facility or facility staff to assign, reassign, or

refuse to assign a room to a transgender resident other than in accordance with the resident's gender identity. This requirement provides no special rights to transgender residents; rather, it only clarifies that gender-based room assignment decisions involving transgender residents must be made according to the resident's gender identity rather than their biological sex at birth.

But the same provision then creates an exception to the general rule: it is *not* unlawful for a facility or facility staff to assign or reassign a room to a transgender resident other than in accordance with the resident's gender identity *if* the resident has so requested. In conclusory fashion, Taking Offense asserts the room assignment provision provides transgender residents "special rights to choose whether to be assigned a roommate according to the transgender person's gender identity or his/her biological sex/gender." Building on that assertion, Taking Offense contends principles of equal protection require that non-transgender residents be given the same rights as transgender residents to dictate their roommate assignments. Specifically, Taking Offense claims: "biological, physical, genetic, sexual females have rights to intimate association, privacy, security, and autonomy to decline to accept roommates of the male sex, whatever may be the other person's 'gender identity.' "

Although we understand the point, Taking Offense fails to explain how the room assignment provision provides any *rights* to transgender residents not also provided to non-transgender residents. We recognize that the provision establishes that it is *not unlawful* to assign a room to a transgender resident other than in accordance with the resident's gender identity where the resident has made such a request. But Taking Offense's assumption that this exception also establishes the *affirmative right* of transgender residents to insist any roommate requests be honored is not well taken. The provision at issue does not even require the facility to provide transgender residents with the ability to make such a request, let alone require a facility or its staff to honor--or even

33

consider--a transgender resident's room assignment request.[10] The provision simply declares it *not unlawful* for a facility to accommodate a transgender resident's request. (§ 1439.51, subd. (a)(3).)

Taking Offense fails to show that the right afforded to transgender residents by the room assignment provision--the right to a room assignment in accordance with the resident's gender identity--is any different from the right afforded to non-transgender residents. Accordingly, we conclude Taking Offense has failed to establish that the room assignment provision violates equal protection.

In addition to its equal protection argument, Taking Offense also asserts that the room assignment provision violates non-transgender residents' freedom of intimate association by not extending to those residents the right to choose extended to transgender residents. However, as we have discussed, the room assignment provision does not recognize any right to intimate association for transgender residents not provided to non-transgender residents. Additionally, to the extent Taking Offense contends that non-transgender residents of long-term care facilities have a right to intimate association, its challenge to the room assignment provision is misplaced because that provision does not facially restrict any long-term care facility resident's right of intimate association. Accordingly, Taking Offense's argument lacks merit.

---

[10] Section 1439.51, subdivision (a)(2) makes it unlawful for a facility or facility staff to "[d]eny a request by residents to share a room" where that decision is based wholly or partially on the resident's actual or perceived sexual orientation, gender identity, gender expression, or HIV status.

## DISPOSITION

The judgment denying Taking Offense's petition for writ of mandate, declaratory and injunctive relief, with respect to section 1439.51, subdivision (a)(5) is reversed. In all other respects, the judgment is affirmed. Each side is to bear its own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

 

_____/s/_____

Duarte, J.

We concur:

_____/s/_____

Hull, Acting P. J.

_____/s/_____

Robie, J.

35

HULL, Acting P. J., Concurring.

I concur. I write separately to address further the issue of intimate association. Taking Offense argues that a resident's right to intimate association prevails not just over a transgender resident's choice of roommates, but also over the facility's mere assignment of roommates pursuant to the room assignment provision in Health and Safety Code section 1439.51, subdivision (a)(3) and regardless of any resident's choice or preference. Taking Offense contends that the room assignment provision on its face interferes with a resident's right of intimate association if, for example, the facility assigns a resident with a male physical appearance to room with a resident who has a female physical appearance and gender at birth who opposes sharing a room with someone of the opposite physical appearance and gender at birth.

The majority concludes that the room assignment provision does not facially restrict any long-term care facility resident's right of intimate association. In this concurrence, I explain briefly why the majority's holding on that issue is correct and why Taking Offense's argument can be addressed only in an as-applied challenge.

To succeed on a facial challenge, Taking Offense must establish that the statute " 'is unconstitutional in all of its applications.' (*Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 449 [[]170 L.Ed.2d 151].)" (*City of Los Angeles v. Patel* (2015) 576 U.S. 409, 418 [192 L.Ed.2d 435].) Taking Offense does not meet this burden. It has not established as a matter of law that the relationship between residential roommates at a long-term care facility always qualifies as the type of intimate association which the Constitution protects against state interference.

Defining the constitutional right of intimate association, the United States Supreme Court "has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a

1

fundamental element of personal liberty." (*Roberts v. U.S. Jaycees* (1984) 468 U.S. 609, 617-618 [82 L.Ed.2d 462] (*U.S. Jaycees*).)

The high court in *U.S. Jaycees* explained the type of intimate relationships the Constitution protects. I quote the opinion at length: "The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State. [Citations.] Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State. [Citations.] Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty. [Citations.]

"The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family— marriage, [citation]; childbirth, [citation]; the raising and education of children, [citation]; and cohabitation with one's relatives, [citation]. Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of

2

qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities—such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection. Accordingly, the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees. [Citations.]

"Between these poles, of course, lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State. Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails *a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments.* [Citation.] We need not mark the potentially significant points on this terrain with any precision. We note only that factors that may be relevant include size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." (*U.S. Jaycees, supra*, 468 U.S. at pp. 618-620, italics added [state statute's prohibition of discrimination in places of public accommodation based on sex constitutionally applied to chapters of the Jaycees Club and required them to admit women; statute did not violate male club members' rights of intimate association].)

The United States Supreme Court has not held that the constitutional protection to intimate association is restricted to relationships among family members. (*Board of Directors of Rotary Internat. v. Rotary Club of Duarte* (1987) 481 U.S. 537, 545 [95 L.Ed.2d 474] (*Rotary Club*).) Rather, "the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal

3

aspects of one's life.' ([*U.S. Jaycees, supra*, 468 U.S.] at pp. 619-620.)" (*Rotary Club, supra*, 481 U.S. at p. 545.)

California's Constitution "affords greater privacy, expressive, and associational rights in some cases than its federal counterpart. (Cal. Const., art. I, §§ 1, 2; [citations].)" (*Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 85.) In that vein, two California courts applying the criteria set forth *in U.S. Jaycees* have extended intimate associational rights beyond the creation of familial or similarly few and intimate relationships, but they did so based on the unique facts before them. In *Hart v. Cult Awareness Network* (1993) 13 Cal.App.4th 777, 788-789, the court of appeal held that an unincorporated association that was designed to educate the public on the practices of "destructive cults" was protected by intimate association rights. The association limited membership to families and former members of "destructive groups," and the relationship between its members primarily involved intimate personal concerns. In *Pacific-Union Club v. Superior Court* (1991) 232 Cal.App.3d 60, 73-75, the court of appeal held that members of a private social club were entitled to intimate association protection. Membership in the club was highly selective and relatively small, and the club's sole purpose was social exchange among its members in a very private setting.

In both of these cases, the courts extended intimate association rights beyond close family relationships due to the unique characteristics of the human relationships involved. In this matter, by contrast, the record contains no evidence by which we can assess where the roommate relationship's "objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." (*U.S. Jaycees, supra*, 468 U.S. at p. 620.) The mere fact that the roommates, presumptively unrelated, share a room at a long-term care facility is an insufficient basis on which a court could determine whether the relationship qualifies as a constitutionally protected intimate relationship. As the case authorities cited above demonstrate, whether the right of intimate association

4

protects a relationship from state interference, particularly in a non-familial setting, requires a fact-based analysis.

Taking Offense relies on *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC* (9th Cir. 2011) 666 F.3d 1216 (*Fair Housing Council*), to assert that a roommate relationship qualifies for the right of intimate association.  The court of appeals' holding in that case, however, is based on the factual scenario of a person leasing a room or space in his or her residential dwelling to another person.  That is not this case.

In *Fair Housing Council*, an internet company provided a roommate-matching website.  Through the website, it asked questions about the sex and sexual preference of potential roommates.  It matched site users to be roommates based in part on those characteristics and provided them a list of housing seekers and available rooms.  (*Fair Housing Council, supra*, 666 F.3d. at pp. 1218-1219.)

The federal Fair Housing Act prohibits discrimination on the basis of sex in the rental of a "dwelling."  (*Fair Housing Council, supra*, 666 F.3d. at p. 1219.)  The court of appeals nonetheless held that the internet company did not violate the Fair Housing Act by matching persons on the basis of sex or sexual preference.  It reached this conclusion by interpreting the term "dwelling" for purposes of the statute to refer to an independent housing unit, not shared living units.  The latter interpretation raised constitutional concerns regarding the right of intimate association due to the nature and characteristics of the relationship created when a person leases part of his or her residential dwelling to another person.  (*Id*. at pp. 1220-1222.)

The court reasoned, "To determine whether a particular relationship is protected by the right to intimate association we look to 'size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship.'  ([*Rotary Club, supra*,] 481 U.S. at p. 546.)  The roommate relationship easily qualifies:  People generally have very few roommates; they are selective in choosing roommates; and non-roommates are

5

excluded from the critical aspects of the relationship, such as using the living spaces. Aside from immediate family or a romantic partner, it's hard to imagine a relationship more intimate than that between roommates, who share living rooms, dining rooms, kitchens, bathrooms, even bedrooms." (*Fair Housing Council, supra*, 666 F.3d at pp. 1220-1221.) "Holding that the [Fair Housing Act] applies inside a home or apartment would allow the government to restrict our ability to choose roommates compatible with our lifestyles. This would be a serious invasion of privacy, autonomy and security." (*Id.* at p. 1221.)

The key factors in the court of appeals' ruling were the selective manner in which the relationship was created and the expectations and characteristics of a relationship created when a person chooses to lease part of his or her living space to another. By contrast, in the case before us, there is no evidence of the selective creation or characteristics of a relationship between roommates in a long-term care facility or other pertinent factors. Without an evidentiary showing, a court is unable to determine whether the relationship qualifies as a constitutionally protected intimate association.

I understand the concerns set forth in plaintiff's complaint, but we must leave a solution to those concerns to an individual case and to another day.


                _____/s/_____
                Hull, Acting P. J.

6

ROBIE, J., Concurring.

I concur fully in the majority opinion but write separately to express further thoughts on the use of pronouns. One's name or the pronoun that represents that name is the most personal expression of one's self. To not call one by the name one prefers or the pronoun one prefers, is simply rude, insulting, and cruel. The impact of using inappropriate pronouns is even more offensive and hurtful when it occurs in an environment where one cannot choose the persons with whom one associates. The Legislature recognized this fact (as recounted in the opinion) but unfortunately chose a prophylactic remedy to eliminate misuse of pronouns that just went too far. Instead of mandating that employers ensure the use of proper pronouns in the workplace, the Legislature unwisely made misuse of pronouns a crime. When we rule this law cannot stand, we do not reject the need for persons to use appropriate pronouns but, in my opinion, are suggesting that the Legislature fashion a workable means of accomplishing the laudable goal of the legislation.

_____/s/_____

Robie, J.

1